80 A.3d 1238

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Miguel A. PADILLA, Appellant.**

Supreme Court of Pennsylvania.

Argued April 14, 2010.

Resubmitted Sept. 20, 2013.

Decided Oct. 31, 2013.

450

456

Jules Epstein, Esq., Kairys, Rudovsky, Messing & Feinberg, Philadelphia, J. Alexander Hershey, Esq., Thorp Reed & Armstrong, L.L.P., Pittsburgh, for Miguel A. Padilla.

Marc Alan Bookman, Esq., Robert Brett Dunham, Defender Association of Philadelphia, for Government of The United Mexican States.

Jackie Atherton Bernard, Esq., Richard A. Consiglio, Esq., Blair County District Attorney's Office, Amy Zapp, Esq., PA Office of Attorney, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, STEVENS, JJ.

## *OPINION*

Justice McCAFFERY.

This is a direct appeal from the judgment of sentence of death on three counts of first-degree murder. We affirm the judgment of sentence.

In the very early morning hours of August 28, 2005, Appellant fatally shot three men outside of the United Veterans Association ("UVA"), a private social club in Altoona, Blair County, after he and two friends, Travis Shumaker and Shir-

ley Shumaker, were denied admission. The victims were Alfred Mignogna, the owner of the club; Frederick Rickabaugh, the bouncer; and Stephen Heiss, a bystander/patron of the club. Shortly after the shootings, Appellant called 911 and told the operator that he thought he had hurt someone. Police found Appellant at the Shumaker residence and took him into custody approximately an hour after the shootings. Appellant was charged by information with three counts of criminal homicide; one count of aggravated assault, felony of the first degree; one count of aggravated assault, felony of the second degree; and one count each of recklessly endangering another person and illegal alien not to possess/use a firearm.[1] At trial, which was held in Blair County before a jury chosen from citizens of Cumberland County, defense counsel acknowledged that Appellant had shot the three men, but he attempted to introduce a defense of diminished capacity due to alcohol- and marijuana-induced intoxication. On September 12, 2006, the jury found Appellant guilty of three counts of first-degree murder and one count each of aggravated assault and recklessly endangering another person. Following a penalty phase hearing, on September 14, 2006, the jury found three aggravating circumstances and three mitigating circumstances,[2] determined that the former outweighed the latter, and voted to impose the death penalty for each murder conviction. On February 1, 2007, the court sentenced Appellant to death. Appellant now appeals to this Court, pursuant

---

**1.** Respectively, 18 Pa.C.S. § 2501(a) (criminal homicide); § 2702(a)(1) (aggravated assault); § 2702(a)(4) (aggravated assault); § 2705 (recklessly endangering another person); § 6105(c)(5) (illegal alien not to possess/use a firearm). It is undisputed that Appellant is a Mexican national who was illegally residing in the United States at the time of the murders.

**2.** The aggravating circumstances were the following: committed the killings in the course of perpetrating a felony involving illegal possession of a firearm, 42 Pa.C.S. § 9711(d)(6); knowingly created a grave risk of death to another person, § 9711(d)(7); and has been convicted of another murder committed either before or at the time of the murder at issue, § 9711(d)(11). The mitigating circumstances were the following: under the influence of extreme mental or emotional disturbance at the time of the killings, § 9711(e)(2); positive adjustment to incarceration, § 9711(e)(8); and a good father, § 9711(e)(8). *See* Sentencing Verdict Slip, dated September 14, 2006.

to 42 Pa.C.S. § 9711(h)(1),[3] raising the following six issues for our review, which we reproduce verbatim:

■ Did the trial court err in denying—over the course of the trial proceedings—several motions to appoint new counsel for Mr. Padilla when his appointed counsel were plagued by debilitating conflicts of interest?

■ Did the trial court err in refusing for over a month to appoint counsel for an unpopular and indigent defendant charged with three counts of first-degree murder?

■ Did the trial court violate international law in interfering with Mexico's efforts to provide consular assistance to Mr. Padilla?

■ Did the trial court err in instructing the jury that there was no evidence of diminished capacity when a psychiatric expert testified that Mr. Padilla had consumed a great deal of alcohol, smoked marijuana, and lacked the capacity to form a specific intent to kill?

■ Did the trial court err in refusing to vacate the death sentence and impose a life sentence when there was no proof of two aggravating circumstances during the penalty phase and the predicate "felony" for a third aggravating circumstance was a misdemeanor?

■ Did the trial court err in denying post-trial motions filed on Mr. Padilla's behalf?

Appellant's Brief at 4 ("Statement of Questions Involved").[4]

## SUFFICIENCY OF THE EVIDENCE

■ Before addressing Appellant's claims, we must independently review the legal sufficiency of the evidence to support his first-degree murder convictions, as we do in all cases in which a sentence of death has been imposed. *See, e.g., Commonwealth v. Briggs*, 608 Pa. 430, 12 A.3d 291, 306 (2011). In a sufficiency review, we determine whether the evidence presented at trial and all reasonable inferences de-

---

**3.** A sentence of death shall be subject to automatic review by the Supreme Court of Pennsylvania pursuant to its rules. 42 Pa.C.S. § 9711(h)(1).

**4.** We have reordered Appellant's issues for ease of disposition.

rived therefrom, viewed in the light most favorable to the Commonwealth as verdict-winner, are sufficient to establish all the elements of first-degree murder beyond a reasonable doubt. *Id.*

■ The elements of first-degree murder are as follows: (1) a human being was unlawfully killed; (2) the defendant was responsible for the killing; and (3) the defendant acted with malice and a specific intent to kill. 18 Pa.C.S. § 2502(a); *Commonwealth v. Houser*, 610 Pa. 264, 18 A.3d 1128, 1133 (2011).

■ First-degree murder is an intentional killing, *i.e.*, a "willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(a) and (d). Specific intent to kill as well as malice can be inferred from the use of a deadly weapon upon a vital part of the victim's body. Houser, supra at 1133–34; *Briggs, supra* at 306–07; *Commonwealth v. Wright*, 599 Pa. 270, 961 A.2d 119, 130–31 (2008). Recently, in *Briggs, supra* at 307, we concluded that the appellant's deliberate and repeated use of a firearm to shoot the victims in the chest and/or abdomen established his specific intent to kill.

■ As mentioned above, the only issue at trial was whether Appellant had the requisite malice and intent to kill, as the defense conceded that Appellant shot the victims. *See* Notes of Testimony ("N.T."), 9/6/06, at 31; Appellant's Brief at 19 ("There was no dispute at the guilt-phase trial that [Appellant] shot and killed three people."). The evidence that Appellant acted with malice and with specific intent to kill the victims was substantial. Harry Kamerow, M.D., a pathologist who performed autopsies on the three victims at the request of the Blair County Coroner's Office, testified as follows regarding his findings. Mr. Mignogna suffered three separate gunshot wounds: one to the left side of the chest, one to the left flank, and one to the right thigh; his death was caused by the gunshot wound to his chest, which ruptured the left and right ventricles of his heart. N.T., 9/6/06, at 109, 115, 133. Mr. Rickabaugh suffered four gunshot wounds: one to the left side of the chest, one to the left upper back, one to the right

midback, and one a graze wound to the left side of the chest; his death was caused by the penetrating gunshot wound to the chest, which resulted in severe avulsion of the right lobe of the liver. *Id.* at 120, 124, 127–28, 130, 132–33. Mr. Heiss was killed by a single gunshot wound to the right side of the chest, which ruptured the right atrium of his heart. *Id.* at 105–07, 133. Similar to *Briggs, supra,* the manner in which Appellant killed the victims established his specific intent to kill.

Other testimony, by persons who were standing outside the UVA club when the murders took place, provided further evidence of the deliberate, intentional nature of the shootings. Mark Hott testified that, at the beginning of the confrontation, Mr. Shumaker argued with Mr. Mignogna and Mr. Rickabaugh after being denied entry to the club. N.T., 9/6/06, at 139–46. Then, Mr. Hott testified, Appellant walked away from the group to a car parked near the club, fumbled around in the passenger side of the car, walked back with something in his hand, approached Mr. Rickabaugh from the back, aimed, and fired three shots into Mr. Rickabaugh. *Id.* at 147–48, 156–57. Next, Mr. Hott testified, Appellant turned slightly to the left and fired more shots, hitting Mr. Mignogna, who was standing next to Mr. Hott. *Id.* at 149–50. At this point, Mr. Hott ran inside the club, but he continued to hear gunshots. *Id.* at 150. Mr. Hott estimated that Appellant was approximately six feet from Mr. Rickabaugh and twelve to fifteen feet from Mr. Mignogna when he shot the men. *Id.* at 157.

Michael Bryant, another club patron on the night of the murders, provided testimony consistent with that of Mr. Hott. Mr. Bryant testified that he saw a small altercation outside the UVA club between Mr. Mignogna and Mr. Shumaker, and he tried to separate the two arguing men. N.T., 9/7/06 at 24–29. Then, Mr. Bryant testified, Appellant came from the parking lot carrying a firearm, which he raised in front of him with both arms, pointed, and fired multiple times. *Id.* at 33–35, 45, 52. The gunfire prompted Mr. Bryant to run from the scene, around the back of the UVA club building, at which point he realized that Appellant was also running in that direction. *Id.* at 35–37. Mr. Bryant testified that although he

was fearful that Appellant was coming after him, Appellant ran past him. *Id.* at 38–40. Mr. Bryant also testified that Appellant ran normally, was not unsteady, and did not stumble or stagger. *Id.* at 52–53.

Two other patrons at the UVA club on the night of the murders testified similarly. Matt Neymeyer and Tanya Kline were standing close to one or more of the victims when they saw Appellant point a gun at the victims and fire multiple times. *Id.* at 97–103, 128–34.

Ed Perino, who lives near the UVA club, was walking in the neighborhood when the murders took place. He testified that he heard gunshots; ran into Appellant coming from the area of the UVA club; recognized him as someone he had seen with some frequency in the neighborhood, especially at the Shumakers' residence; and asked him what was going on. *Id.* at 155–58. Mr. Perino testified that Appellant was running in a straight line, not stumbling, nor weaving back and forth, and did not appear to be drunk. *Id.* at 162–63, 166–67.

Three officers from the Altoona Police Department testified that they found Appellant in front of the Shumakers' residence within a short time after the murders[5] and took him into custody after they received a radio report that someone wanted to turn himself in because he thought he had hurt somebody. *See* testimony of Sergeant John Roefaro, N.T., 9/7/06, at 188–92, 200; testimony of Lt. Michael Lowery, *Id.* at 226–27; testimony of Detective Scott Koehle, N.T., 9/8/06, at 177–78, 191. The officers testified that, during his apprehension, Appellant responded to commands without delay or confusion, and walked without difficulty or stumbling or loss of balance, even when asked to walk backward with raised arms. N.T., 9/7/06, at 193–96; 228–31; N.T., 9/8/06, at 179–82. Appellant understood the officers and was able to communicate with them without difficulty, in normal, clear speech. N.T.,

5. The murders took place at approximately 2:00 a.m. on August 28, 2005. Lt. Michael Lowery testified that he received radio information regarding someone who wanted to turn himself in at approximately 2:52 a.m. the same day. N.T., 9/7/06, at 226. Very shortly thereafter, Appellant gave a statement to police officers, *i.e.,* from 3:10 a.m. until 4:16 a.m. N.T., 9/8/06, at 207.

9/7/06, at 193–94, 197–98; 231–32; N.T., 9/8/06, at 182. The officers, all of whom were experienced police officers, concluded that Appellant was not drunk or impaired in any way, but rather appeared very normal. N.T., 9/7/06, at 197–98; 232–33; N.T., 9/8/06, at 180–83.

Detective Koehle further testified that Appellant provided a statement as to his activities on the night of the murder, in which he indicated that he and Mr. Shumaker had gone out for the evening at around 10 p.m., stopping at a couple of strip clubs, with Appellant driving [6] because he was not planning to drink. Although Appellant acknowledged having four or five beers during the evening, he also stated that he was not intoxicated. N.T., 9/8/06, at 188–93, 216, 224. Appellant asserted that, approximately a year before the murders, he had sought treatment for panic attacks, which presented with symptoms similar to a heart attack. He had prescription medication for these panic attacks, but had not taken any in approximately one month because he had not been back to the doctor to get a refill. *Id.* at 197–98, 218–20. Appellant claimed in his statement that the last thing he remembered before the murders was "last call" at a strip club around 1:30 a.m.; he claimed he had no recollection of the murders, but only of waking up on the porch of the Shumakers' residence. *Id.* at 199, 211.

Testimony as to how, where, and when police found the murder weapon was provided by Sergeant Roefaro and Lt. Lowery. Based on information received from Mr. Perino, *see* summary of Perino testimony, *supra*, Sergeant Roefaro searched the area where Mr. Perino had observed Appellant running subsequent to the murders. In a wooded area not far from a trail, the officer found a Sig Sauer P220 handgun and its magazine in a hollow log that had been stuffed with fresh green vegetation. N.T., 9/7/06, at 201–03, 210–13; *see also id.* at 234–36. Lt. Lowery testified that, adjacent to the trail,

6. Appellant indicated that he was driving Mr. Shumaker's car on the night of the murders. N.T., 9/8/06, at 190–91. Appellant's car, a 2001 Jaguar, was found parked in front of the Shumakers' residence. *Id.* at 191; N.T., 9/7/06, at 234.

about seven or eight feet from the hollow log, he observed a piece of corrugated metal, under which he found a briefcase. *Id.* at 236–38. Examining the contents of the briefcase, Lt. Lowery inventoried the following: a Pennsylvania-issued driver's license in Appellant's name; a VISA credit card issued in Appellant's name; two business cards, under the names "Padilla Construction" or "S & P Construction" with the name Miguel Padilla; a hotel receipt with Appellant's signature dated sometime in July 2005; an insurance card in Appellant's name for four vehicles, one of which was the Jaguar found in front of the Shumakers' residence; and a SAM'S Club card with Appellant's name on it. *Id.* at 242–43.

Additional testimony regarding the handgun found in the hollow log established that it had been sold to Travis Shumaker on May 25, 2005, by a local merchant. N.T., 9/8/06, at 27.[7] Appellant acknowledged in his statements to police that he knew Mr. Shumaker had a permit to carry a handgun and that he kept one under the front seat of his car at times. *Id.* at 198. Trooper Robert Hagins, a forensic firearm and tool mark examiner for the Pennsylvania State Police, testified that his analysis showed that the bullets found in the bodies of Mr. Mignogna and Mr. Rickabaugh were fired from the gun sold to Mr. Shumaker and found in the hollow log.[8] *Id.* at 150–53. Finally, Dave Freehling, an expert in the analysis of gunshot residue, testified that he detected gunshot residue on swabs taken from Appellant's hands after his apprehension. *Id.* at 139–42.

This evidence is unquestionably sufficient to establish that Appellant shot Mr. Mignogna, Mr. Rickabaugh, and Mr. Heiss with malice and with specific intent to kill. Appellant shot Mr. Mignogna and Mr. Rickabaugh three and four times, respectively, hitting both of them in the chest and causing their deaths. Several witnesses observed Appellant point the murder weapon directly and from relatively close range at these victims prior to firing. Mr. Heiss was a by-stander, and does

7. Testimony of Mark McNeely, owner of the Allegheny Trade Company.

8. The bullet found in the body of Mr. Heiss was too mutilated to be analyzed. N.T., 9/8/06, at 153–54.

▉▉▉▉▉

not appear to have been a specific target, but that offers Appellant no relief. *See Commonwealth v. Jones,* 590 Pa. 202, 912 A.2d 268, 279 (2006) (citing the doctrine of transferred intent, 18 Pa.C.S. § 303(b)(1), pursuant to which "the intent to murder may be transferred where the person actually killed is not the intended victim"). Having concluded that the evidence was sufficient to convict Appellant of first-degree murder in the shooting deaths of all three victims, we turn to Appellant's specific claims.

## 1. TRIAL COURT APPOINTED "CONFLICTED" COUNSEL

▉▉▉▉ In Appellant's first issue, he asserts that he was denied his Sixth Amendment right to counsel because the court appointed counsel who had a conflict of interest. Specifically, Appellant claims that his court-appointed guilt phase counsel, Donald Speice, Esq., had a conflict of interest because, in his role as public defender of Blair County, he had initially denied Appellant's application for appointed counsel.[9, 10]

9. This claim was raised prior to trial by motion of the Government of Mexico and by Appellant *pro se.* *See* Motion of the Government of Mexico Requesting the Appointment of Conflict–Free Counsel for Defendant Miguel Angel Padilla, filed 2/6/06, at 3–9; *Pro Se* Motion of Defendant Miguel Angel Padilla Requesting a Stay of Trial Court Proceedings Pending Resolution of Appeal Filed by the Government of Mexico, filed 8/9/06, at 8–10. The trial court addressed the matter in two filings: Order of Court, filed 2/22/06; and Opinion and Order, filed 5/18/06, at 3–7.

10. Appellant alleges two other conflicts of counsel in this first issue: (a) penalty phase counsel Edward Blanarik stipulated that Appellant had committed a firearms offense, despite Appellant's instructions to the contrary, thereby creating a conflict; and (b) both Mr. Speice and Mr. Blanarik refused to accept assistance from the Mexican Consulate and did not keep the Mexican Consulate informed of all proceedings in Appellant's case, against his wishes and instructions. Appellant's Brief at 69–71.

With regard to (a), the record shows that Mr. Blanarik stipulated that Appellant had committed an offense involving the possession or use of a firearm, a strategy designed to prevent the jury from learning that Appellant is an illegal alien. The stipulation is discussed in Issue 5, *infra.* Here, Appellant asserts that he and his counsel "had a material disagreement ... concerning a course of action in the representation, which created a conflict of interest." Appellant's Brief at 69–70. A

■ To establish that an actual conflict of interest burdens counsel, an appellant must show that "counsel actively represented conflicting interests[,] and the actual conflict adversely

"material disagreement" with respect to a course of action in the representation does not constitute a conflict of interest. *See* text, *infra,* for discussion of the meaning of conflict of interest. Appellant's citations to authority do not support his assertions to the contrary. Any claim in this matter sounds in ineffective assistance of counsel, which is properly brought on collateral review. *See Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726, 738 (2002) (holding that a petitioner should wait to raise claims of ineffective assistance of trial counsel until collateral review).

In a footnote to this sub-claim, Appellant also asserts the following: "Mr. Blanarik also could not (and did not) provide [Appellant] with a candid and informed discussion about his legal options and strategies prior to the murder trial, including the advantages and disadvantages of going to trial compared to negotiating or accepting a plea, and the pros and cons of taking the stand in his own defense." *Id.* at 70 n. 29. Along with a citation to a case from a federal district court in Delaware, this sentence constitutes the entirety of Appellant's "development" of this claim. To the extent that this claim is intelligible, it is a claim of ineffective assistance of counsel, which is properly brought on collateral review. *See Grant, supra.*

With regard to (b), Appellant asserts that, despite his repeated instructions, Mr. Speice and Mr. Blanarik did not keep the Mexican government informed of proceedings in his case and refused to accept assistance from the Mexican government that could have spared Appellant's life. Appellant's Brief at 71. Appellant further asserts, without explanation, that counsel's actions or inactions in this regard "created a conflict of interest." *Id.* These general assertions, plus a few citations to decisional law of questionable relevance, constitute the entirety of this sub-claim. This sub-claim is identical to a sub-claim raised as part of Issue 3. *Compare* Appellant's Brief at 71 (asserting, in Issue 1, that appointed counsel "did not keep the Mexican consulate informed about the case and refused to accept the assistance of the Mexican government") (internal quotation marks omitted) with *Id.* at 79 (asserting, in Issue 3, that Appellant's counsel "refused to accept any assistance from Mexico and did not keep the Mexican government informed concerning proceedings in the case"). However, Appellant has withdrawn this claim for purposes of direct appeal, recognizing that it is a claim of ineffective assistance of counsel and thus is more properly raised on collateral appeal. *See* n.15 *infra* (citing Appellant's Post–Argument Submission by Permission, filed 4/19/10, at 1–2).

Finally, Appellant includes a general conflict of interest sub-claim at the end of Issue 1, which merely reasserts the allegations already made as follows: "Any reasonable person in [Appellant's] position would not trust a lawyer who initially refused to accept the representation, stipulated to an aggravating circumstance against the defendant's instructions, and rejected critical assistance from the Mexican government." Appellant's Brief at 71. These are merely repetitious assertions, addressed in our discussion of Issue 1, *see* text, or in this footnote.

affected counsel's performance." *Commonwealth v. Small,*
602 Pa. 425, 980 A.2d 549, 563 (2009) (citing *Commonwealth v.
Spotz,* 587 Pa. 1, 896 A.2d 1191, 1232 (2006)); *see also Commonwealth v. Williams,* 602 Pa. 360, 980 A.2d 510, 522 (2009)
(citing *Mickens v. Taylor,* 535 U.S. 162, 171, 122 S.Ct. 1237,
1243, 152 L.Ed.2d 291 (2002), for the definition of "actual
conflict of interest" for Sixth Amendment purposes as a
"conflict of interest that adversely affects counsel's performance").

█ Pursuant to the Public Defender Act,[11] statutory responsibility to provide legal counsel to criminal defendants
who lack sufficient funds to obtain private counsel rests with
the public defender's office. *See Dauphin County Public
Defender's Office v. Court of Common Pleas of Dauphin
County,* 578 Pa. 59, 849 A.2d 1145, 1149 (2004) (citing 16 P.S.
§ 9960.6(a)). Furthermore, the initial responsibility for ascertaining whether an individual seeking representation has an
ability to procure "sufficient funds to obtain legal counsel" also
rests with the public defender's office. *Id.* (quoting 16 P.S.
§ 9960.6(b)).

Before applying these principles and rules to Appellant's
claim here, *i.e.,* that public defender and trial counsel Donald
Speice was burdened with a conflict because he initially denied
Appellant's request for appointed counsel, we first must consider the sequence of events following Appellant's arrest on
August 28, 2005. Appellant's preliminary arraignment was
held the day after his arrest, and within days thereafter, he
made application for the appointment of counsel, which was
received in the public defender's office on September 6, 2005.
Notably, in his application for counsel, Appellant indicated
that he was paying approximately $500 per month to support
another person, but Appellant failed to provide any information as to his sources of income, leaving blank the entire
second page of the application, which requires a listing of all of
the applicant's sources of income and assets. *See* Appellant's
Application for Counsel, stamped as received on 9/6/05, at 1–2.

11. Act of 1968, Dec. 2, P.L. 1144, No. 358, *as amended,* 16 P.S.
§§ 9960.1–9960.13.

Mr. Speice, as public defender of Blair County, denied Appellant's application, citing the following reasons: "This office received information that Defendant has attempted to hire private counsel and has indicated he could obtain as much as $50,000.00; Mexican Consulate has also made efforts to obtain counsel for him." *Id.* at 3.[12] On September 9, 2005, Appellant appealed the public defender's decision to the trial court, which affirmed on September 12, 2005.

On October 12, 2005, the Government of Mexico filed a motion requesting the appointment of counsel for Appellant, which motion was granted on October 14, 2005. In a subsequent opinion, the trial court set forth its reasons for not appointing counsel for Appellant prior to that time. *See* Opinion and Order of the Trial Court, dated 5/18/06, at 2–3. The court explained that, prior to its receipt of Mexico's October 12, 2005 motion, the court's understanding was that the Mexican Consulate was exploring the possibility of representing Appellant. Although the trial court had been attempting to confirm Mexico's intentions, it was only upon receipt of the October 12, 2005 motion that the trial court realized that the Government of Mexico would not be representing Appel-

12. The Commonwealth asserts that Appellant met with Thomas Dickey, Esq., an attorney who had previously represented him, at the police department shortly after his arrest, but this is not of record.

In addition, the Commonwealth includes a copy of the Blair County Prison Visitor Register, which indicates that an official from the Mexican Consulate in Philadelphia visited Appellant on September 1, 2005, which was four days after the murders. The prison register also indicates that Appellant was visited in the same prison on September 21, 2005, by a Mexican Consulate official and by Michael O'Connor, an attorney for the Consulate. *See* Commonwealth's Answer to Appeal and Jurisdictional Statement of the Government of Mexico and Motion to Quash the Appeal Filed by Counsel Who Are Not of Record, filed 7/16/08, at ¶ 12, and Blair County Prison Visitor Register attached to motion.

The Commonwealth further represents that on September 19, 2005, Mr. Dickey filed a Motion for Admission *pro hac vice* pursuant to Rule 301 of the Bar Admission Rules, indicating that the Mexican Consulate in Philadelphia had retained Mr. O'Connor to represent the Government of Mexico in asserting the consular rights of Appellant, and opining that Mr. O'Connor appeared to qualify for admission to the bar for this purpose. Commonwealth's Brief at 43 and Ex. 1. This motion is not of record, but Mr. O'Connor subsequently signed numerous motions before the trial court in his capacity as counsel for Mexico.

lant. *Id.* In addition, the trial court stated that it was aware, at the time it declined to appoint counsel, that Appellant was being represented in an involuntary termination matter by private counsel, specifically Thomas Dickey, Esq. This fact lent support, in the trial judge's mind, to Appellant's financial capacity to obtain his own counsel. Given this situation, the trail court concluded that it was "prudent [ ] to await [Appellant's] and/or Mexico's decision and defer proceedings for a time to see how these issues would resolve." *Id.* at 5. However, upon receipt of Mexico's October 12, 2005 motion, the trial court directed the Blair County Office of the Public Defender to represent Appellant even though the court acknowledged some remaining question as to Appellant's financial capability. *Id.* at 3. Thus, 47 days after Appellant was arrested and detained, Mr. Speice, the public defender, assumed the responsibility for Appellant's representation.

Appellant now asserts that Mr. Speice was burdened with a conflict of interest because he "already had personally participated in the deprivation of [Appellant's] right to counsel" by initially refusing Appellant's request for appointed counsel. Appellant's Brief at 67. Furthermore, Appellant asserts that this alleged conflict prevented Mr. Speice from arguing before the court that Appellant's right to counsel had been violated by the delay of 47 days before the court appointed counsel on his behalf. *Id.* at 67–68. Appellant's assertions are meritless.

It is important to recognize that Mr. Speice, in his role as public defender, was fulfilling his statutory duty when he assessed Appellant's written request for counsel and denied it based on two reasonable factors. *See* text, *supra.* The trial court correctly analyzed the circumstances presented here as follows:

In reaching [his] decision [to deny Appellant's initial request for appointment of counsel], Attorney Speice performed a ministerial duty which he performs in every case-namely, determining based on information available whether an individual is entitled to free legal representation through his office. Once that determination is made by Mr. Speice, any individual who believes they are aggrieved by a particular

determination has a right of appeal to a Judge of this Court. [Appellant] exercised that appeal [sic] on September 9, 2005, and the initial refusal of services by the Public Defender's office was affirmed by [the trial court] on September 12, 2005. All of this is totally consistent with appropriate procedure.

Of course, if the [c]ourt had overruled the decision, Mr. Speice would have undertaken representation of [Appellant] immediately. If his decision is affirmed, however, (as it was here) his office does nothing further since it does not represent [Appellant].

\* \* \*

The one certainty in all of this is that Mr. Speice had no conflict with [Appellant]. Mr. Speice had "jurisdiction" of the question of his office's representation of [Appellant] only from September 5, 2005[,] until his determination on September 6, 2005. After that, any delay and the consequences of that delay are attributable not to Mr. Speice but to the Court and (indirectly) the Government of Mexico.

Trial Court Opinion, dated 5/18/06, at 4–5.

The trial court properly concluded that Mr. Speice's denial of Appellant's request for appointed counsel created no conflict of interest. Appellant has proffered absolutely no evidence to show that Mr. Speice represented conflicting interests, or that his performance vis-à-vis Appellant was adversely affected merely because he had performed his statutory duty, and in so doing, had concluded that Appellant had the ability to secure private counsel. Furthermore, as we explain in Issue 2, *infra*, Appellant's claim that his constitutional right to counsel was violated by the 47–day delay in appointment of counsel has no merit. Taken generally, Appellant's contention that Mr. Speice was burdened by a conflict of interest would lead to an entirely untenable proposition, to wit, that the public defender would have a conflict with virtually any defendant whom the public defender initially considered ineligible for public-financed counsel, but who subsequently was found to qualify for same. This proposition is incompatible with the

statute, which expressly places the responsibility for the representation of indigent defendants, as well as for the initial determination of eligibility for appointed counsel, with the public defender. *See* 16 P.S. § 9960.6(a) and (b); *Dauphin County Public Defender's Office, supra* at 1149. Thus, Appellant's assertion that Mr. Speice had a conflict of interest is supported neither by law nor with any facts, and he is entitled to no relief.

## 2. RIGHT TO COUNSEL

In a claim related to Issue 1, Appellant asserts that his convictions should be reversed because he was denied counsel for 47 days after his arrest, which denial allegedly violated Pennsylvania Rule of Criminal Procedure 122(A), and the right to counsel and due process under, respectively, the Sixth and Fourteenth Amendments to the United States Constitution.[13] Appellant's Brief at 50–53, 60–62. Appellant ar-

---

13. Appellant also asserts that his rights to counsel and to due process under the Pennsylvania Constitution, Article I, Section 9, were violated. However, he advances no distinct argument based on the Pennsylvania Constitution, and we will not divine one on his behalf. *See Commonwealth v. Briggs*, 608 Pa. 430, 12 A.3d 291, 318 n. 26 (2011) (declining to consider a claim under the Pennsylvania Constitution in support of which the appellant advances no argument, nor cites any case law). We note only that we have previously held that the right to counsel under Article I, § 9 of the Pennsylvania Constitution is co-terminus with the Sixth Amendment right to counsel for purposes of determining when the right attaches. *Commonwealth v. McCoy*, 601 Pa. 540, 975 A.2d 586, 590 (2009); *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831, 844 (2003); *Commonwealth v. Arroyo*, 555 Pa. 125, 723 A.2d 162, 170 (1999). All of Appellant's constitutional arguments are addressed in our discussion of his Sixth Amendment claim.

Appellant further asserts that the delay in the appointment of counsel was "an extreme departure from ... and breached norms established by the American Bar Association." Appellant's Brief at 61 (citing Am. Bar Ass'n, Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (rev. ed. 2003)). As we stated in *Commonwealth v. Wright*, 599 Pa. 270, 961 A.2d 119, 132 (2008) (internal citation omitted), "[t]his Court has never endorsed or adopted the ABA guidelines in full. We do not do so now." We will not address this sub-claim further, except to note that Appellant's assertions of "deviations from the norms established by the ABA guidelines" do **not** establish that his rights under "the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and corre-

gues that the delay in appointment of counsel prejudiced him because evidence as to his mental state and his degree of alcohol- and drug-induced intoxication at the time of the murder was irrevocably lost. *Id.* at 55–58. Appellant relies on the fact that, during the first 47 days after his arrest, "no mental health expert was appointed, no psychiatric evaluation was conducted, and no action was taken on [his] behalf to preserve the most direct evidence bearing on his mental state at the time of the shootings." *Id.* at 50. Therefore, Appellant argues, he "was not able to present sufficient evidence at trial to fully corroborate his account 'that he had consumed a great deal of alcohol and smoked marijuana [on the] night [of the murders].'" *Id.* (internal quotation marks quoting N.T., 9/11/06, at 41, the testimony of Dr. Steven Ragusea, who was reporting what Appellant told him). As a proposed remedy for the 47–day period in which he did not have appointed counsel, Appellant seeks dismissal of the first-degree murder charges, with leave for the Commonwealth to file third-degree murder charges and remand for a new trial. *Id.* at 59. Appellant is entitled to no relief on this issue for the reasons we discuss below, considering first his claim of a Rule 122(A) violation.

Pursuant to Rule 122(A), counsel shall be appointed "in all court cases, prior to the preliminary hearing to all defendants who are without financial resources or who are otherwise unable to employ counsel[, or] in all cases, by the court, on its own motion, when the interests of justice require it." Pa.R.Crim.P. 122(A) (emphasis added). "Ideally, counsel should be appointed to represent indigent defendants ... immediately after preliminary arraignment in all court cases." Comment to Rule 122.

Appellant's preliminary hearing was held on October 27, 2005, two weeks after the trial court appointed counsel. Thus, the record clearly shows that, in compliance with Rule 122(A), the court appointed counsel for Appellant prior to his

sponding law of the Commonwealth" were violated. Appellant's Brief at 62.

preliminary hearing, and his assertion that the delay in appointment of counsel violated Rule 122 is meritless. Appellant also contends that the timing of his preliminary hearing violated Pa.R.Crim.P. 540(F)(1)(a), which requires a preliminary hearing to be held not more than ten days after the preliminary arraignment unless the time is extended for cause shown. The reason for the continuance of Appellant's preliminary hearing is not of record, but as Appellant notes, it was possibly because he was not represented by counsel. Appellant's Brief at 55 n.26. Given the legitimate reasons provided by the public defender and the trial court for not immediately appointing counsel for Appellant, as discussed in Issue 1, we decline to conclude that the trial court did not have cause to continue Appellant's preliminary hearing.

We turn next to Appellant's claim that his Sixth Amendment right to counsel was violated. The Sixth Amendment right to counsel is as follows:

In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence.

U.S. Constitution, 6th Am.

"[T]he core purpose of the [Sixth Amendment] counsel guarantee was to assure 'Assistance' at trial, when the accused was confronted with both the intricacies of the law and the advocacy of the public prosecutor." *United States v. Cronic,* 466 U.S. 648, 654, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984); *see also United States v. Gouveia,* 467 U.S. 180, 190, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984) (reiterating that "the [Sixth Amendment] right to counsel exists to protect the accused during trial-type confrontations with the prosecutor"). Accordingly, the United States Supreme Court has consistently held that the Sixth Amendment right to counsel does not attach until a prosecution is commenced, *i.e.,* until "the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Rothgery v. Gillespie County,* 554 U.S. 191, 198, 128 S.Ct. 2578, 171 L.Ed.2d 366 (2008) (citations omitted).

■ Once attachment of the Sixth Amendment right to counsel has occurred, "the accused at least is entitled to the presence of appointed counsel during any 'critical stage' of the post[-]attachment proceedings." *Rothgery, supra* at 212, 128 S.Ct. 2578. The High Court has recognized that not just the trial, but also certain pretrial proceedings are critical stages, whereat "the accused is confronted, just as at trial, by the procedural system, or by his expert adversary, or by both, in a situation where the results of the confrontation might well settle the accused's fate and reduce the trial itself to a mere formality." *Gouveia, supra* at 189, 104 S.Ct. 2292 (internal quotation marks and citations omitted); *see also Rothgery, supra* at 212 n. 16, 128 S.Ct. 2578 (defining " 'critical stages' as proceedings between an individual and agents of the State (whether formal or informal, in court or out) that amount to trial-like confrontations, at which counsel would help the accused in coping with legal problems or meeting his adversary") (internal quotation marks and citations omitted). As to the timing of the appointment of counsel, the High Court has concluded that "counsel must be appointed within a reasonable time after attachment to allow for adequate representation at any critical stage before trial, as well as at trial itself." *Rothgery, supra* at 212, 128 S.Ct. 2578.

■ As a general rule, a conviction will not be vacated for a violation of the Sixth Amendment right to counsel in the absence of a showing that the reliability of the defendant's trial was undermined. *Bell v. Cone,* 535 U.S. 685, 695–98, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Cronic,* 466 U.S. at 658–59 & n. 26, 104 S.Ct. 2039; *Commonwealth v. Johnson,* 574 Pa. 5, 828 A.2d 1009, 1015 (2003) (citing *Chapman v. California,* 386 U.S. 18, 22, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) for the general principle that constitutional errors do not require automatic reversal but rather may be subject to a harmless error analysis). However, the United States Supreme Court has identified several circumstances in which prejudice resulting from a violation of the Sixth Amendment right to counsel is presumed. *Bell, supra* at 695, 122 S.Ct. 1843 (quoting *Cronic, supra* at 658, 104 S.Ct. 2039 as having identified "three

situations implicating the right to counsel that involved circumstances so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified"). One of these presumptively prejudicial circumstances arises when the accused has suffered a complete denial of counsel at a critical stage of trial. *Cronic, supra* at 659 & n. 25, 104 S.Ct. 2039 (providing citations to cases in which the High Court found constitutional error without a showing of prejudice because "counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding"); *Johnson, supra* at 1015 (granting the appellant a new trial after concluding that this Court was required to presume prejudice because the appellant was completely, albeit temporarily, denied counsel during a critical stage of his trial).

■■■ With respect to Appellant's Sixth Amendment claims in the instant case, he first asserts that "the ten days following a preliminary arraignment on first[-]degree murder charges should be recognized as a 'critical stage' of the proceedings," and thus prejudice should be presumed if the accused is denied counsel during this time. Appellant's Brief at 64 (internal quotation marks added). To support this assertion, Appellant argues that an early psychiatric examination is necessary to document and preserve direct evidence of a defendant's mental state, including any influence of alcohol or drug ingestion, within a short time after the offense. *Id.* at 62–63; *see also id.* at 56–57. Appellant cites a Declaration of Marc Bookman, Esq., then an assistant public defender in the Philadelphia Defender's Office, who writes that "[t]he first days after arrest are a critical time during which counsel is presented with the only opportunity to assess first-hand any lingering indicia of [the defendant's] decompensated mental state or intoxication which might support a diminished capacity defense" or a mitigating circumstance related to the defendant's mental status at the time of the offense. Declaration of Marc Bookman, dated 1/31/06, at 1–2 (Exhibit C in the Motion of the Government of Mexico Requesting the Appointment of Conflict–Free Counsel for Defendant Miguel Angel Padilla, filed 2/6/06).

We have absolutely no inclination to extend the legal defini-
tion of the term "critical stage" to encompass the entirety of
the ten-day period following a preliminary arraignment on a
first-degree murder charge, irrespective of particular circum-
stances or events that actually occur, judicially or otherwise,
relative to the case during that time. As discussed *supra*, the
United States Supreme Court has made clear as recently as
2008 that, for purposes of the Sixth Amendment, "critical
stages" are defined as "proceedings between an individual and
agents of the State (whether formal or informal, in court or
out,) that amount to **trial-like confrontations**...." *Rothgery*,
*supra* at 212 n. 16, 128 S.Ct. 2578 (internal quotations and
citations omitted and emphasis added). To hold that an entire
ten-day block of time is a "critical stage," regardless of
whether any actual "proceedings" or "trial-like confrontations"
take place during that time, would extend the High Court's
Sixth Amendment jurisprudence beyond reason or recognition.
Such an extension would also, in essence, mandate appoint-
ment of counsel for any and all yet-unrepresented defendants
immediately after preliminary arraignment, regardless of
whether the accused had requested appointment of counsel
and regardless of his or her financial capacity or intent to
obtain private counsel. We will not impose such an unreason-
able and unworkable requirement. Because we do not consid-
er the entire ten-day period of time following preliminary
arraignment a "critical stage" of criminal proceedings, Appel-
lant is not entitled to a presumption of prejudice with respect
to his Sixth Amendment claim.

■ Next, Appellant maintains that his right to due pro-
cess under the Fourteenth Amendment was violated by the
delay in the appointment of counsel. Appellant's Brief at 65.
He contends that the fundamental fairness of the proceedings
against him was undermined by the delay in the appointment
of counsel because such delay negatively affected his ability to
investigate a diminished capacity defense and a case for
mitigation based on impaired capacity. *Id.* at 65, 55–56.
More specifically, Appellant argues that, because appointment
of counsel was delayed for 47 days, he did not undergo an

immediate psychiatric examination, and thus evidence concerning the effect of alcohol and drugs on his mental state at the time of the murders was irrevocably lost. *See id.* at 57 ("[Appellant's] trial counsel was unable to present sufficient evidence at trial to fully corroborate [Appellant's] account" of his alcohol and marijuana use on the night of the murders); *Id.* at 58 ("If [Appellant] would have been able to preserve evidence of his extensive alcohol and drug use, there would have been a reasonable possibility for the jury to return a guilty verdict of third-degree murder" instead of first-degree murder).

Appellant's assertions are entirely speculative, unsupported by any facts, and indeed contradicted by evidence of record; hence, his claim is meritless. Appellant fails to explain what additional evidence of his alcohol and drug use should have been presented, how it would have been preserved by an early psychiatric examination, or how it would have swayed the jury toward a finding of diminished or impaired capacity.[14] Appellant also ignores the fact that evidence of his mental state, as influenced by alcohol and drugs, **was** presented at trial. Two acquaintances testified that Appellant drank heavily, was upset and stressed, and was "out of it" after the suicide of a friend, which occurred approximately a week before the murders. N.T., 9/11/06, at 105, 113–14. Shirley Shumaker, who was with Appellant on the night of the murders, testified that Appellant had drunk at least two beers at a strip club they had patronized prior to going to the UVA Club. *Id.* at 131. Dr. Ragusea, a psychologist who evaluated Appellant, also testified as to possible cumulative effects of Appellant's drug

14. Appellant cites a newspaper report of a waitress who had served alcohol to Appellant on the night of the murders and recalled that he was drunk; she apparently was subpoenaed by the defense but failed to appear. Appellant's Brief at 57 (citing N.T., 9/11/06, at 3). We do not comprehend, nor does Appellant explain, how a psychiatric examination of Appellant could have preserved such testimony. In addition, evidence that Appellant had been drinking, or even that he was drunk, does not establish a finding of diminished capacity, as we discuss in detail in Issue 4, *infra.* Furthermore, Appellant ignores the testimony from several witnesses and police officers, summarized in the text, *supra,* that he did not appear to be intoxicated during and immediately after the shootings.

and alcohol use. *See* text, *infra*, Issue 4. It is pure speculation, unsupported by any evidence whatsoever, that an early psychiatric examination would somehow have supported an investigation, that somehow would have led to additional testimony, that somehow would have established not merely alcohol and/or drug use, but also diminished capacity. Appellant's assertions in this due process sub-claim are not grounded in any facts whatsoever, and he is entitled to no relief.

## 3. VIOLATION OF THE VIENNA CONVENTION

■ In Appellant's third issue, he contends that "the trial court [ ] entered orders that effectively deprived [him] of the benefits of consular assistance" from the Government of Mexico, in violation of the Vienna Convention on Consular Relations (Vienna Convention).[15, 16] Appellant's Brief at 74–75. Appellant asserts that the trial court's "numerous steps" depriving him of the benefits of consular assistance included the following.

15. The Vienna Convention, Apr. 24, 1963, [1970] 21 U.S.T. 77, T.I.A.S. No. 6820, was ratified by the United States, upon the advice and consent of the Senate, in 1969. *See Medellin v. Texas*, 552 U.S. 491, 499, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008).

In this issue, Appellant also raised two other sub-claims based on alleged violations of the Vienna Convention: (1) the police failed to advise Appellant of his right to consular notification and assistance at the time of interrogation; and (2) trial counsel failed to consult with and accept assistance from the Government of Mexico. *See* Appellant's Brief at 74–85. At oral argument, Appellant withdrew these claims, acknowledging that trial counsel did not preserve the first claim, and that no record has been made in the trial court for the second claim. *See* Appellant's Post–Argument Submission by Permission, filed 4/19/20, at 1–2 (acknowledging that the withdrawn claims are "more properly claims of ineffective assistance of counsel" and citing *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002)).

16. Appellant also asserts, in a two-sentence footnote, that the trial court violated another, bilateral treaty, to wit, the Convention Respecting Consular Officers, when the court "prevented Mexican consulate officers from addressing the court and from submitting filings with the Prothonotary." Appellant's Brief at 79 n.36. This asserted violation of the Convention Respecting Consular Officers is neither explained factually, nor supported with any citations to the record or the law. Such an undeveloped claim is not reviewable and is waived. *See, e.g., Commonwealth v. Briggs*, 608 Pa. 430, 12 A.3d 291, 326 n. 34 (2011) (concluding that an undeveloped claim is waived).

[O]ver six months before trial, the trial court ordered the Prothonotary not to accept filings by Mexico on [Appellant's] behalf. (*See* D.E. 78, Padilla Decl., ¶ 7; D.E. 9, Order Ct., 3.) The trial court also refused to consider the merits of *pro se* motions prepared by [Appellant] with consular assistance, and refused to allow representatives of Mexico to address the tribunal on [Appellant's] behalf. (*E.g.*, D.E. 46, N.T. 8/21/2006, 8–10; D.E. 49, N.T. 8/23/2007, 111–12 ("I don't give a damn about Mexico's motion.").)

Appellant's Brief at 79.

Before we can address these claims, we must set forth, from the record, the extensive history of motions filed by Appellant acting *pro se* and/or by the Government of Mexico acting on his behalf.

On October 12, 2005, the Government of Mexico filed its first motion on behalf of Appellant, asking the court to appoint counsel for Appellant. As we discussed under Issue 1, the trial court granted this motion on October 14, 2005, and appointed the Blair County Office of the Public Defender to represent Appellant. Importantly, Appellant continued to be represented by the public defender during the time that all of the subsequent motions at issue here, as discussed below, were filed.

On February 6, 2006, and February 10, 2006, the Government of Mexico filed two motions, respectively entitled "Motion of the Government of Mexico Requesting the Appointment of Conflict–Free Counsel," and "Motion of the Government of Mexico Requesting a Change of Venue to Ensure that Defendant Miguel Angel Padilla Receives Due Process, a Fair Trial and a Reliable Sentencing Determination." The trial court addressed and denied both of these motions in its order of February 21, 2006. The court explained that counsel had been appointed for Appellant, and, therefore, motions would be considered only if they were filed by counsel of record. The court reminded the Government of Mexico that it had had fair opportunity to undertake representation of Appellant, but had chosen not to

do so; indeed, the Government of Mexico had explicitly asked the court to appoint counsel for Appellant. The court noted that representatives of the Government of Mexico had already attended status conferences related to Appellant's case, and were welcome to continue to do so. However, the court directed the Government of Mexico to go through Appellant's counsel of record if it desired to have input into the case, assisting these counsel, "rather than interfering with them." Order of Court, dated 2/21/06, at 2. With regard specifically to the motion for change of venue, the trial court noted that this matter had already been discussed in status conferences and a similar motion was to be filed by Appellant's counsel of record.[17] *Id.* at 3. Finally, the court directed the Prothonotary's Office "to refuse further filings of record from other than record counsel." *Id.*

Despite the trial court's order, the Government of Mexico filed another motion, on April 18, 2006, entitled "Motion of the Government of Mexico to Vindicate the Treaty Rights of the Government of Mexico and those of Defendant Miguel Angel Padilla, a Mexican National." In response, the trial court again reviewed all of the previous motions that had been filed by the Government of Mexico and the court's actions thereon. Opinion and Order of Trial Court, dated 5/18/06. The court reiterated its concern that "allowing unfettered discretion to Mexico to file motions when, how, and as to what issues [it] chose invited chaos and a legitimate question as to who was in charge of [Appellant's] case—counsel of record and this Court or the Government of Mexico." *Id.* at 5–6. The court further explained that its order of February 21, 2006, "was designed to enforce appropriate motions practice in Pennsylvania and empower appointed counsel to represent [Appellant]." *Id.* at 6. The court again noted that it had invited the Government of Mexico to attend status conferences and had informed the Government of Mexico of hearings of record. *Id.* However, the court strongly concluded that the "intervention" sought by

17. Trial counsel did file a similar motion, and the trial court granted a change of venire on May 10, 2006.

the Government of Mexico was inappropriate and unjustified either under any international treaty or under the Pennsylvania Rules of Criminal Procedure. *Id.* at 7–8. On June 16, 2006, the Government of Mexico filed a notice of appeal of the trial court's May 18, 2006 order with this Court, alleging that the order violated Appellant's rights pursuant to the Vienna Convention on Consular Relations and the Bilateral Consular Convention. On August 17, 2006, we quashed the appeal as interlocutory. *Commonwealth v. Padilla,* 589 Pa. 247, 908 A.2d 265 (2006).

Beginning during the time when the Government of Mexico's appeal of the trial court's May 18, 2006 order was pending, Appellant filed five *pro se* motions. The first was filed on August 9, 2006, and was entitled *"Pro Se* Motion of Defendant Miguel Angel Padilla Requesting a Stay of Trial Court Proceedings Pending Resolution of Appeal Filed by the Government of Mexico." The trial court denied this motion as "inappropriately filed since [Appellant] has counsel of record." Order of Court, filed 8/16/06, at 1. The trial court, however, also took "the opportunity of this Order," to address the Government of Mexico's appeal and request for a stay of trial, which was then pending before this Court. *Id.* The trial court explained that all preparations had been made for Appellant's trial, which was scheduled to commence on August 21, 2006, and that all of the issues raised in the motion were matters for prospective appeal in the event that Appellant was convicted. As noted above, this Court quashed the appeal on August 17, 2006, rendering moot any request for a stay.

Appellant's second motion was filed on September 5, 2006, the first day of trial testimony, and was entitled *"Pro Se* Motion for Continuance of Trial Court Proceedings." In this motion, Appellant contended that counsel was unprepared and that a mitigation investigation had not been conducted, and he sought appointment of new, "conflict-free" counsel. The trial court denied this motion on the same day without comment.

Appellant's third motion was filed on November 27, 2006, just before he was scheduled to be sentenced, and it was entitled *"Pro Se* Motion of Defendant Miguel Angel Padilla to

Withdraw *Nolo Contendere* Plea to the Charge of Unlawful Possession of a Firearm Under 18 Pa.C.S.A. § 6105." [18] The firearm charge referred to in this motion was illegal alien not to possess or use a firearm, which charge arose from the events on the night of the murders. Appellant had entered a *nolo contendere* plea to the charge, but in this motion he sought to withdraw that plea, asserting that he was innocent of the charge, that he had not been advised of the consequences of entering a plea, and that he was denied his right to be advised by the Mexican consulate concerning the plea. *Id.* at 3. After entertaining argument as to whether sentencing should go forward, the trial court granted a continuance, and directed the Commonwealth to file a written response to Appellant's *pro se* motion to withdraw his plea. Order of Court, dated 11/29/06. On January 22, 2007, the trial court *nolle prossed* and dismissed the firearm charge against Appellant, as requested by the Blair County District Attorney's Office.

Appellant's fourth motion, filed on January 29, 2007, and entitled *"Pro Se* Motion and Brief of Defendant Padilla for Appointment of New Counsel due to Numerous Debilitating Conflicts of Interest," [19] raised many of the same claims as in the previous motions, but in addition alleged "Betrayal and Deception on the Eve of Trial" related to the stipulation of a "False Aggravator." The stipulation at issue related to the charge, discussed above, of illegal alien not to possess or use a firearm. Appellant's fifth motion was filed on February 12, 2007, and was entitled *"Pro Se* Motion for a New Trial." It was followed on February 26, 2007, by a document entitled "Declaration of Miguel Angel Padilla in Support of *Pro Se* Motion for a New Trial," in which Appellant made a number of

18. Appellant acknowledged in this motion that he had been assisted in its preparation by a representative of the Government of Mexico. *Pro Se* Motion of Defendant Miguel Angel Padilla to Withdraw Nolo Contendere Plea to the Charge of Unlawful Possession of a Firearm Under 18 Pa.C.S.A. § 6105, at 2.

19. Appellant acknowledged in this motion that he had been assisted in its preparation by a representative of the Government of Mexico. *Pro Se* Motion and Brief of Defendant Padilla for Appointment of New Counsel due to Numerous Debilitating Conflicts of Interest, at 1 n.1.

unsupported assertions, mostly related to the alleged denial of his right to assistance from the Government of Mexico. On April 10, 2008, the trial court denied Appellant's "various" *pro se* motions "as inappropriately filed in light of the fact that [Appellant] had [c]ounsel of [r]ecord at the time of each filing." Order of Court, dated 4/10/08.

The above recitation of facts of record reveals that, despite the trial court's order of February 21, 2006, directing the prothonotary to accept for filing only those documents signed by Appellant's counsel of record, numerous motions were filed after this time by the Government of Mexico and by Appellant acting *pro se*. Pursuant to Pennsylvania Rule of Criminal Procedure 576(A)(4), when a defendant who is represented by counsel submits a motion or other document *pro se,* the clerk of courts shall accept it for filing, time stamp it, docket it, place it in the case file, and then forward a copy of the document to counsel for the defendant and for the Commonwealth. As a comment to the Rule indicates, the time-stamp and docketing requirement "only serves to provide a record of the filing, and does not trigger any deadline nor require any response." Cmt. to Rule 576(A)(4). Appellant does not claim that the clerk of courts did not comply with this rule, nor does he claim that the clerk of courts declined to file any document. Thus, while the trial court's order directing the prothonotary to accept for filing only those documents signed by Appellant's counsel of record was inconsistent with current practice, as set forth under the Rules of Criminal Procedure, Appellant provides no evidence—and indeed does not even assert—that the court's order was ever given effect.[20] Appellant is not entitled to relief merely on the basis of a trial

20. As discussed in the text, *supra,* the current Rules of Criminal Procedure require that a document submitted *pro se* by a defendant who is represented by counsel be accepted for filing and then forwarded to counsel. Pa.R.Crim.P. 576(A)(4); *see Commonwealth v. Pitts,* 603 Pa. 1, 981 A.2d 875, 876 n. 2 (2009).

However, the prior rule had directed the clerk of courts **not** to docket or record a *pro se* motion from a represented defendant, but rather just to forward it to the defendant's counsel. *See Pitts, supra* at 876 n. 2 (citing Pa.R.Crim.P. 576(C), *amended* March 3, 2004, effective July 1, 2004).

court order that, although inconsistent with a current rule, led to no improper action or omission.

Consistent with Rule 576, decisional law from this Court has clarified Commonwealth policy regarding hybrid representation. *No* defendant has a right to hybrid representation, either at trial or on appeal. *Commonwealth v. Ellis*, 534 Pa. 176, 626 A.2d 1137, 1139 (1993); *Commonwealth v. Ali*, 608 Pa. 71, 10 A.3d 282, 293 (2010) (characterizing as a "legal nullity" a *pro se* Pa.R.A.P.1925(b) statement filed by an appellant who was represented by counsel); *Commonwealth v. Colson*, 507 Pa. 440, 490 A.2d 811, 822 (1985) (holding that there is no constitutional right for a represented defendant to act as co-counsel). Here, Appellant was represented by court-appointed counsel, as both he and the Government of Mexico had requested. Appellant had no right to hybrid representation and thus no right to demand that the trial court address his *pro se* motions on the merits.[21]

Disregarding the clarity of these procedural rules, the essence of Appellant's claim here is that the rules do not apply to him because he is a foreign national whose consulate assisted in the preparation of his *pro se* motions. Specifically, Appellant contends that, by not considering the merits of his *pro se* motions prepared with assistance of the Mexican consulate, the trial court improperly denied him the benefits of consular assistance, in violation of Article 36 of the Vienna Convention. Appellant's Brief at 79. Appellant further contends that the trial court also violated Article 36 of the Vienna Convention by refusing to allow representatives of the Government of Mexico to address the tribunal on Appellant's behalf. *Id.* Appellant avers, in broad and general terms, that the trial court's alleged violations of Article 36 caused him prejudice, and he asks this Court to fashion a remedy, specifically, to vacate his convictions or death sentences, and to remand for,

21. We cannot fail to note that the trial court patiently and repeatedly addressed many of the motions filed by Appellant acting *pro se* or by the Government of Mexico acting on his behalf. *See* text, *supra*. Many of these motions were repetitious, raising the same claims time and again; furthermore, in at least one instance, these motions raised the same issue (change of venue), as was raised in Appellant's counseled motions.

respectively, a new trial or a new penalty hearing. *Id.* at 77–85.

■■■ The claims that Appellant raises in this issue focus on his individual rights under the Vienna Convention. Addressing such claims involves interpretation of the treaty, a question of law, for which our standard of review is *de novo* and our scope is plenary. *Commonwealth v. Crawley*, 592 Pa. 222, 924 A.2d 612, 614 (2007).

For reasons that we describe in detail in the paragraphs below, Appellant's claim is entirely untenable, and the fact that Appellant's *pro se* motions were prepared with the assistance of the Mexican consulate is not determinative. As interpreted by the United States Supreme Court, the Vienna Convention cannot be read to provide support for Appellant's assertion that Article 36 exempted him from the well-established procedural rules concerning the filing of *pro se* motions by represented appellants—regardless of who assisted him in the preparation of these motions. Furthermore, Appellant's assertions of prejudice are vague and speculative in the extreme, ungrounded in any factual evidence, and his demands for a remedy are in conflict with holdings from the United States Supreme Court.

As the United States Supreme Court has recently summarized, the preamble to the Vienna Convention provides that the treaty's purpose is to "contribute to the development of friendly relations among nations." *Medellin v. Texas*, 552 U.S. 491, 499, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008) (citing 21 U.S.T. at 79). Article 36, the provision at issue here, was drafted to "facilitate the exercise of consular functions," *Medellin, supra* (citing 21 U.S.T. at 100), and to that end, it "addresses communication between an individual and his consular officers when the individual is detained by authorities in a foreign country." *Sanchez–Llamas v. Oregon*, 548 U.S. 331, 337, 126 S.Ct. 2669, 165 L.Ed.2d 557 (2006). Specifically, pursuant to Article 36, when a foreign national is detained, the authorities must notify the consular officers from the detainee's home country, must promptly forward any communication

addressed to the consular post by the detainee, must allow consular officers to communicate with a detainee, and must inform the detainee of these rights. *Sanchez–Llamas, supra* at 338–39, 126 S.Ct. 2669 (citing 21 U.S.T. at 100–01); *Commonwealth v. Baumhammers,* 599 Pa. 1, 960 A.2d 59, 97 (2008). The High Court was careful to make clear the limits of the rights provided by Article 36:

> Article 36 does not guarantee defendants *any* assistance at all. The provision secures only a right of foreign nationals to have their consulate *informed* of their arrest or detention—not to have their consulate intervene, or to have law enforcement authorities cease their investigation pending any such notice or intervention.

*Sanchez–Llamas, supra* at 349, 126 S.Ct. 2669 (emphases in original).

With regard to implementation, Article 36 provides that the rights set forth therein "shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this Article are intended." Art. 36(2), 21 U.S.T. at 101 (quoted in *Sanchez–Llamas, supra* at 339, 126 S.Ct. 2669).

In *Sanchez–Llamas,* the Supreme Court consolidated and decided two cases that concerned the availability of judicial relief for violations of Article 36.[22] In both cases, the petitioner-defendants were foreign nationals who were arrested for serious crimes, but not informed that they could request that the consulates of their home countries be notified of their

22. The High Court declined to decide whether the Vienna Convention granted enforceable rights to individuals. The Court found it unnecessary to resolve this question because it concluded that the petitioners were not entitled to relief on their claims. *Sanchez–Llamas, supra* at 343, 126 S.Ct. 2669. The High Court assumed, without deciding, that Article 36 of the Vienna Convention does grant enforceable rights to an individual. We follow the High Court's lead in the case before us, assuming, strictly for purposes of this appeal, that Article 36 does grant Appellant individually enforceable rights. However, we also note the High Court's acknowledgment that diplomatic avenues are the primary means of enforcing the Vienna Convention. *Id.* at 350, 126 S.Ct. 2669.

detentions. In the first case, the petitioner sought to have his incriminating statements to police suppressed pursuant to the exclusionary rule, based on the failure of the authorities to comply with the notification requirement of Article 36. The High Court declined to apply the exclusionary rule to suppress the statements. The High Court recognized that the Vienna Convention does not prescribe specific remedies for violations of Article 36, but rather "expressly leaves the implementation of Article 36 to domestic law." *Sanchez–Llamas, supra* at 343, 126 S.Ct. 2669. The Court then concluded as follows:

> [W]here a treaty does not provide a particular remedy, either expressly or implicitly, it is not for the federal courts to impose one on the States through lawmaking of their own.

*Id.* at 347, 126 S.Ct. 2669; *see also Commonwealth v. Judge,* 591 Pa. 126, 916 A.2d 511, 526–27 (2007) (in the context of a different treaty, quoting *Sanchez–Llamas* for this proposition and adding that "[t]his Court cannot enforce as laws those treaties . . . which Congress has not chosen to incorporate into our domestic legal system").

Based largely on the Vienna Convention's failure to set forth a remedy, the High Court denied the petitioner's claim that his statements to police should be suppressed under the exclusionary rule because he had not been informed of his right under the treaty to notify his consulate. *Sanchez–Llamas, supra* at 343–50, 126 S.Ct. 2669; *see also Leal Garcia v. Texas,* —— U.S. ——, 131 S.Ct. 2866, 180 L.Ed.2d 872 (2011) (*per curiam*) (declining to issue a stay of execution that the appellant had sought based on proposed federal legislation to implement a decision of the International Court of Justice that interpreted the Vienna Convention's notification provision).

In the second of the two *Sanchez–Llamas* cases, a state court had dismissed the petitioner's Article 36 claim because he had failed to raise the claim at trial or on direct appeal, and thus he was barred, pursuant to state procedural rules, from raising it on collateral review. *Id.* at 342, 351–52, 126 S.Ct. 2669. The petitioner argued that such state procedural default rules did not apply to Article 36 claims. In rejecting the

petitioner's argument and refusing to suspend the normally applicable state procedural default rules, the High Court reiterated that "the procedural rules of the forum State govern the implementation of the treaty in that State." *Id.* at 351, 126 S.Ct. 2669 (citation omitted). Concluding that "claims under Article 36 of the Vienna Convention may be subjected to the same procedural default rules that apply generally to other federal-law claims," the High Court affirmed the judgment of the state court dismissing the petitioner's Article 36 claim. *Id.* at 356, 126 S.Ct. 2669 (internal citation omitted).

The holdings of the United States Supreme Court in *Sanchez–Llamas* are directly applicable here, where Appellant has asked this Court to "fashion an appropriate remedy" for the trial court's alleged violation of the Vienna Convention, which alleged violation constituted nothing more than adherence to a well-established procedural bar against hybrid representation. Appellant's Brief at 80. We first point out that, based on *Sanchez–Llamas, supra,* and *Judge, supra,* we must decline Appellant's invitation to devise a remedy for his perceived violations of Article 36. Based upon these precedents, it is simply not within this Court's purview to devise and impose a remedy for violations of a treaty that does not set forth one.

Next, we conclude that there is absolutely no merit to Appellant's assertion of an Article 36 violation in the trial court's handling of his *pro se* motions, regardless of the fact that they were prepared with the assistance of the Government of Mexico. As the United States Supreme Court made clear in *Sanchez–Llamas, supra* at 339 and 351, 126 S.Ct. 2669 Article 36 by its express terms is to be implemented in conformity with the procedural rules of the forum state. In *Sanchez–Llamas,* the High Court upheld a state court's dismissal, based on a procedural default rule, of the petitioner's Article 36 claim. Nonetheless, here, Appellant asserts that the trial court violated Article 36 merely by adhering to this Commonwealth's well-established procedural bar against hybrid representation and, accordingly, declining to consider the

merits of Appellant's *pro se* motions. Based upon the United States Supreme Court's interpretation of Article 36 in *Sanchez–Llamas*, we conclude that Appellant's assertion of an Article 36 violation is meritless.

 Furthermore, Appellant's additional assertion that the trial court violated the Vienna Convention by "refus[ing] to allow representatives of Mexico to address the tribunal on [Appellant's] behalf" likewise must fail. Appellant's Brief at 79. Appellant's development of this claim consists of a citation to the following excerpt of the notes of testimony, which occurred at the end of a morning session during jury selection.[23]

> *Court:* That concludes our list [of potential jurors]. All right. Now, I want to be very clear with our representative of the Mexican consulate who is here. You heard by observation that I don't give a damn about this motion. I mean every word of it.
>
> I am here giving a damn very important (sic) about two things that I really give a damn about. One is this Defendant receiving a fair trial. One is the Commonwealth receiving a fair trial. Nothing is going to interfere with that at this point. What is, and we just aren't going to go there. I don't know what your agenda is or what it isn't, but I'm here to guarantee that fair trial as I understand it. And I'm not going to tolerate any interference with it. All right. We'll recess.
>
> *Mexican Consulate:* May I address the Court for a second?
>
> *Court:* No. Recess until 1:00.

N.T., 8/23/06, Vol. I, at 111–12 (cited in Appellant's Brief at 79).

**23.** Appellant also cites a second excerpt from the notes of testimony, N.T., 8/21/06, at 8–10, in which the issue concerned a *pro se* motion prepared by the Mexican consulate. No Mexican representative sought to address the court, and there was not even any discussion of such possibility. Appellant fails to explain the relevance of this citation to his assertion that the trial court violated the Vienna Convention by refusing to allow representatives of the Government of Mexico to address the court on Appellant's behalf.

It is not clear from the record, nor from Appellant's brief, to which motion the court is referring in the above excerpt. We have no idea of the background to this exchange, no idea what the underlying issue is, no idea of the position of the Government of Mexico, and no idea if the trial court had previously addressed the matter. Appellant fails to present a specific, reasoned, and intelligible argument to support his assertion of an Article 36 violation with regard to the excerpted notes of testimony, *supra*. His position seems to be that a representative of the Mexican consulate should be granted leave to address the court at any time during Appellant's trial merely by virtue of the provisions of the Vienna Convention. Appellant provides no support for such an expansive interpretation of the Vienna Convention, and his view is supported neither by the text of the treaty nor the United States Supreme Court. *See Sanchez–Llamas, supra* at 349, 126 S.Ct. 2669 ("Article 36 does not guarantee defendants *any* assistance at all. The provision secures only a right of foreign nationals to have their consulate *informed* of their arrest or detention—not to have their consulate intervene, . . . .")(emphasis in original).

Finally, although we conclude that there is no merit to any of Appellant's claims of trial court violation of the Vienna Convention, we must also point out that Appellant's assertions of prejudice from these alleged violations are particularly hollow. Appellant asserts only the following general claim:

[T]he Mexican consulate could have provided substantial assistance to [Appellant] throughout the pretrial, trial, and post-trial proceedings. They (sic) were not, however, permitted to do so. The Vienna Convention violations therefore cannot be harmless error.

Appellant's Brief at 80.

Appellant does not even remotely suggest, much less set forth, what specific additional assistance the Government of Mexico would have provided to Appellant but for the order of the trial court. It is impossible to discern from Appellant's brief any hint at all as to the nature of the "substantial

assistance" that the Mexican consulate was "not [ ] permitted" to provide because of the trial court's orders. *Id.* Appellant's assertion of prejudice is speculative, undeveloped, unexplained, unsupported, contrary to the facts of record—and meritless.

For all of the foregoing reasons, Appellant is entitled to no relief on any of his multiple claims of trial court error relating to alleged violations of the Vienna Convention.

### 4. JURY INSTRUCTION AS TO DIMINISHED CAPACITY

In his fourth issue, Appellant contends that his convictions should be vacated because the trial court erred when it instructed the jury that there was no evidence of diminished capacity due to his ingestion of alcohol and/or drugs. After careful review of all of the testimony presented and the trial court's instructions to the jury, we conclude that the instructions were proper.

A defense of diminished capacity negates the element of specific intent, and thus mitigates first-degree murder to third-degree murder. *Commonwealth v. Williams*, 602 Pa. 360, 980 A.2d 510, 527 (2009); *Commonwealth v. Saranchak*, 581 Pa. 490, 866 A.2d 292, 299 (2005). The mere fact of voluntary intoxication does not give rise to a diminished capacity defense. Rather, to prove diminished capacity due to voluntary intoxication, a defendant must show that he was overwhelmed to the point of losing his faculties and sensibilities. *Commonwealth v. Blakeney*, 596 Pa. 510, 946 A.2d 645, 653 (2008); *Commonwealth v. Spotz*, 587 Pa. 1, 896 A.2d 1191, 1218 (2006). Evidence that the defendant lacked the ability to control his or her actions or acted impulsively is irrelevant to specific intent to kill, and thus is not admissible to support a diminished capacity defense. *Commonwealth v. Vandivner*, 599 Pa. 617, 962 A.2d 1170, 1183 (2009).

This Court has previously made clear that a jury instruction regarding diminished capacity due to voluntary intoxication is justified **only** when the record contains evidence

that the accused was intoxicated to the point of losing his or her faculties or sensibilities. *Commonwealth v. Reiff,* 489 Pa. 12, 413 A.2d 672, 674 (1980). Evidence that the accused ingested alcohol or other intoxicating drug—without more—does not warrant a voluntary intoxication instruction. *Id.* In *Reiff,* the evidence showed that the appellant had consumed approximately two and one-half quarts of beer during the several hours before he fatally shot a man, but there was no evidence that the appellant exhibited any signs of intoxication or unusual behavior. *Id.* at 673. Accordingly, we held that the trial court did not err in refusing to give a jury instruction as to diminished capacity due to voluntary intoxication. *Id.* at 674; *see also Commonwealth v. Marinelli,* 547 Pa. 294, 690 A.2d 203, 220–21 (1997) (holding that the trial court did not err by refusing to give a voluntary intoxication charge because, even though there was testimony that the appellant had consumed some alcohol prior to the killing, there was no evidence that the appellant had been overwhelmed or over-powered by alcohol).

Here, Appellant rests his argument as to the propriety of a diminished capacity jury instruction primarily on testimony presented by his psychologist-expert, Stephen Ragusea, Ph.D., who, Appellant avers, testified that "drugs and alcohol prevented [Appellant] from being able to form a specific intent to kill on the night of the shootings." Appellant's Brief at 19–20, 22. As Appellant recognizes, Dr. Ragusea's opinion was based on Appellant's own account of his consumption of alcohol and use of marijuana on the night of the murders, and the Commonwealth introduced some contradictory evidence. *Id.* at 20–21. However, Appellant asserts, "[t]he conflicting psychiatric expert testimony and other testimonial evidence presented a quintessential jury issue on the question of diminished capacity to form specific intent," and the trial court accordingly erred by removing this question from the jury. *Id.* at 21–22. We cannot accept Appellant's assertions because a full reading of the notes of testimony reveals that his interpretation of the import of Dr. Ragusea's testimony is not entirely accurate, and, in addition, he has

ignored the specific and careful wording of the jury instruction that the trial court did give as to the testimony concerning Appellant's alcohol consumption and drug use.

Dr. Ragusea met with Appellant in March 2006, to assess his overall psychological functioning and to consider whether factors such as use of mind-altering substances or emotional status might have affected his ability to form intent. N.T., 9/11/06, at 13, 15. Contrary to Appellant's assertion, Dr. Ragusea did **not** testify that drugs and alcohol prevented Appellant from being able to form a specific intent to kill on the night of the murders. Dr. Ragusea's direct examination testimony consisted in substantial part of answers to hypothetical questions that defense counsel asked based on his recollected summary of the evidence. *Id.* at 16–22. In addition, Dr. Ragusea testified that the effects of Appellant's drug and alcohol use on his thinking, judgment, and memory were to some extent cumulative, *i.e.*, reflected the amount of usage over time. *Id.* at 22–24. Dr. Ragusea briefly discussed Appellant's history of panic disorder, and suggested that it might have made Appellant "more emotionally reactive" to a perceived threat arising from the argument at the UVA club preceding the murders. *Id.* at 25–26. Dr. Ragusea's direct examination ended with the following exchange:

*Defense Counsel:* As we have discussed, there is a legal standard called specific intent to kill which requires that one have the specific intent to kill the individual and that they [sic] are fully aware of that intent at the time they [sic] take the actions. Can you render any opinions based on everything you know about this matter concerning that particular issue or that particular question?

*Dr. Ragusea:* Well, it does not appear to me, based upon my knowledge of the facts, that we have evidence that this was a planned event. You could imagine if someone deliberately, specifically, cold-bloodedly decided to go out and kill several people that they [sic] would choose to do it in a different style other than the way [Appellant] killed these three people. One would try and keep it secretive and hide it and do it in a manner that would not result in prosecution

and incarceration. It seems as if this is an **impulsive act** With some elements of defensive activity towards a **perceived threat** mixed with a great deal of **bad judgment.** Therefore, it seems to me that this tends not to meet those criteria, [Counsel].

*Defense Counsel:* Okay. Thank you very much.

*Dr. Ragusea:* I mean, that is something—[j]ust to clarify, that is not something that I have psychological test evidence to support. That is based upon my experience as a clinical psychologist from doing this kind of work, and the jury is perfectly capable of perceiving and reasoning their way through all of that.

*Defense Counsel:* In fact, there would be no tests available to you to find out what somebody was thinking or what they were capable of thinking at the moment?

*Dr. Ragusea:* That's correct.

*Id.* at 27–29 (emphases added).

On cross-examination, Dr. Ragusea testified that Appellant was of average intelligence, as measured by an intelligence-type test; had normal neurological functioning; exhibited some antisocial tendencies; presented as charming, angry, and bad-tempered; was sad but not clinically depressed; and had problems with anger management, panic attacks, and substance abuse. *Id.* at 36–40. Tellingly, Dr. Ragusea acknowledged that he "[did not] know what kind of shape [Appellant] was in [on the night of the murders]," although Appellant had reported to him that he "had consumed a great deal of alcohol and smoked marijuana that night." *Id.* at 41. On cross-examination, the prosecutor also questioned Dr. Ragusea further on other factors that had been suggested as potentially relevant to Appellant's intent on the night of the murders, including his perception of a threat, his history of panic attacks, and the recent suicide of a friend. *Id.* at 44–45, 53–55, 57.

Only on re-direct examination did defense counsel specifically ask Dr. Ragusea his opinion regarding the effect of drugs

or alcohol on Appellant's ability to form the specific intent to kill. The relevant portions of that testimony are as follows:

*Defense Counsel:* Did you at any time in your direct testimony indicate that in your opinion [Appellant] was under the influence of drugs and/or alcohol to the degree that he could not form the specific intent to kill?

*Dr. Ragusea:* The answer is that **in my opinion his ability to form intent was likely impacted. It's a question of degree.**

*Defense Counsel:* As I recall your testimony, **it was impacted by a list of things, not just the drugs and/or alcohol?**

*Dr. Ragusea:* **That's correct.**

\* \* \*

*Defense Counsel:* ... you are in no way saying that [Appellant] was not capable or did not commit these shootings or perform these shootings, correct?

*Dr. Ragusea:* That's correct. Again, what he told me was that he had shot these people, ....

*Defense Counsel:* Right. So everything you've said has nothing to do with whether or not [Appellant] squeezed the trigger on that gun eight times and fired eight shots?

*Dr. Ragusea:* That's correct.

*Defense Counsel:* It's what was going on in his head at the time and obviously your opinion is based upon your training, your experiences, etc., etc., but there's no way you can ever know, correct?

*Dr. Ragusea:* That's correct.

*Id.* at 65–67 (emphases added).

Then, on re-cross-examination, the prosecutor questioned Dr. Ragusea as follows.

*Prosecutor:* You mean to tell me [Appellant] told you he shot these people?

*Dr. Ragusea:* Yes.

*Prosecutor:* He didn't tell you he didn't remember?

*Dr. Ragusea:* He told me that there was a time when he couldn't remember.

*Prosecutor:* Oh, but he remembered when he talked to you?

*Dr. Ragusea:* When he talked to me, he said he did.

*Prosecutor:* And this bad judgment, that doesn't mean that he didn't form the intent to kill these people, does it?

*Dr. Ragusea:* That's correct.

*Prosecutor:* **And when you're saying that different things likely impacted his situation that night, that doesn't mean that any of those things prevented him from intending to kill these people?** Likely impacted doesn't mean that you are prevented from doing whatever you do, is that right?

*Dr. Ragusea:* **Being impacted may prevent you, it may not prevent you from doing certain actions.**

*Prosecutor:* **So it doesn't mean it prevented him from doing anything, does it?**

*Dr. Ragusea:* **Not necessarily, but it certainly may have, and in my judgment what it did was it prevented him from forming intent.**

*Prosecutor:* **It may have, right?**

*Dr. Ragusea:* **In my judgment it was likely.**

*Prosecutor:* **If his actions, even if they were impulsive— aren't they controllable by him?**

*Dr. Ragusea:* **Yes,** sir.

*Prosecutor:* His actions were controllable. **So, he did not lose control of his faculties in your judgment?** If they're controllable, how could he have?

*Dr. Ragusea:* **The answer is that all of us ultimately have free will. Our ability to make judgments is impacted by many complex variables. At some points it's easier for us to make a clear-headed choice, and at other times it is more difficult to make a clear-headed choice, but we always have the choice.**

*Prosecutor:* A choice is a choice. And his faculties were controllable, were they not? Wasn't his temper controllable if he wanted to control it?

*Dr. Ragusea:* He was not insane at the time of the crime and, therefore, **he had control over his behavior.** This is a more subtle point.

*Id.* at 67–69 (emphases added).

From Dr. Ragusea's testimony, we conclude the following. Dr. Ragusea opined that, because of a number of different factors, one of which was alcohol- and drug-induced intoxication, Appellant's ability to form intent on the night of the murders was "likely impacted," to such a degree that it is likely that Appellant was prevented from forming intent to kill. Dr. Ragusea further opined that Appellant had **not** lost control over his behavior, although Dr. Ragusea believed the murders to be an impulsive act. Dr. Ragusea acknowledged that he did not know what Appellant was thinking or capable of thinking or what was going on in his head on the night of the murders. Importantly, despite thorough and lengthy questioning, neither Dr. Ragusea nor any other witness opined that Appellant's use of drugs and alcohol on the night of the murders overwhelmed him to the point of losing his faculties and sensibilities, thus rendering him unable to form the specific intent to kill. Dr. Ragusea's testimony was much less precise, encompassing not just Appellant's substance abuse, but also his perception of a threat, his history of panic attacks, his anger management problem, and his recent loss of a friend to suicide.[24, 25]

24. On cross-examination, Dr. Ragusea acknowledged that Appellant's panic attacks had "very little" to do with this case. N.T., 9/11/06, at 54. In Dr. Ragusea's view, Appellant's history of panic attacks may have caused him to "react[ ] emotionally in a stronger way" if he perceived a situation as threatening, but typically, panic attacks are associated with increased awareness of a problem and "feelings of helplessness and not aggressiveness." *Id.* at 53–55. Dr. Ragusea also testified that the suicide of Appellant's friend was not "much of a factor in this case." *Id.* at 57. In addition, Dr. Ragusea acknowledged that Appellant had no "physical, medical or mental problem ... that would cause him not to intend to kill these people." *Id.* at 54.

25. Several other witnesses testified that Appellant had drunk alcohol, but none testified that his use of alcohol or drugs on the night of the

With both the relevant legal principles and Dr. Ragusea's testimony in mind, we now consider the trial court's full charge to the jury concerning diminished capacity:

The choice [to reduce first-degree murder to third-degree murder] would occur if evidence was presented that [Appellant] was so overwhelmed by alcohol and/or drugs that he may have lost control of his faculties to such an extent that you had a reasonable doubt whether [Appellant] could form the specific intent necessary to find first[-]degree murder. You remember I told you that this issue might or might not be in the case. Well[,] we heard all of the evidence in the case and based on that evidence **the Court, myself, has concluded that there is no evidence in the case that [Appellant] was so overwhelmed by drugs or alcohol that he could not form specific intent.** Accordingly, you may

murders overwhelmed him to the point of losing his faculties and sensibilities. Martina Vermeulin, a friend of Appellant, testified that Appellant was very upset and very sad after the suicide of his friend a week before the murders, and that he looked "unhealthy," because, she believed, of drug abuse and drinking. N.T., 9/11/06, at 104–05. On cross-examination, Ms. Vermeulin acknowledged that she could not remember if she had seen Appellant take any drugs the week after his friend's suicide, and she had not seen him at all the night of or the day before the murders. *Id.* at 107.

Marcellino Flores, another friend of Appellant, testified that Appellant drank heavily after the suicide of his friend and that he was "out of it [and his] mind wasn't there." *Id.* at 112–13. However, Mr. Flores had great difficulty explaining what he meant by this, other than to say that Appellant didn't "feel right" and didn't "know what to do." *Id.* at 115. Mr. Flores testified that he was not with Appellant the day of the murders and could not remember if he was with Appellant on either of the two days before the murders; hence he did not know how Appellant was acting on any of those days. *Id.* at 119.

Oscar Padilla, Appellant's brother, testified that Appellant started drinking and using various drugs several years before, and got drunk on a couple of beers. *Id.* at 123. He also testified that he saw Appellant the night before the murders and he seemed fine. *Id.* at 127.

Shirley Shumaker, who was with Appellant and her son Travis Shumaker on the night of the murders, testified that Appellant had at least two beers while at a strip club prior to the murders. *Id.* at 130–31. None of this testimony, considered individually or collectively, remotely supports a diminished capacity defense because it does not support the claim that, on the night of the murders, Appellant was overwhelmed by voluntary intoxication to the point of losing his faculties or sensibilities and thus was unable to form the specific intent to kill.

not reduce first[-]degree murder that you have otherwise found to third[-]degree murder **for that reason alone** since the evidence does not support that conclusion. **This does not mean, however, that evidence of drugs or alcohol is completely irrelevant.** The Commonwealth, as you know, has the burden of proving specific intent to kill in connection with first[-]degree murder beyond a reasonable doubt and **you may consider any evidence of drug or alcohol consumption together with all the other evidence in the case to determine if the Commonwealth has met it's [sic] burden of proving specific intent** beyond a reasonable doubt. So[,] you see[,] a relevant consideration as to whether the Commonwealth has proved specific intent or not [sic] but you do not have the ability simply because of drug and alcohol consumption and for no other reason to reduce first[-]degree murder to third[-]degree murder.

N.T., 9/12/06, at 78 (emphases added).

Thus, the trial court instructed the jury that there was no evidence to support a diminished capacity defense based **solely** on drug and alcohol consumption. However, the trial court most certainly did not bar the jury from considering the testimony regarding voluntary intoxication. The trial court's instructions explicitly allowed the jury to consider evidence of drug and alcohol consumption in concert with all the other evidence presented in the case when determining whether the Commonwealth had proven specific intent. These instructions accurately reflected Dr. Ragusea's opinion that a number of factors likely prevented Appellant from forming the specific intent to kill on the night of the murders. The trial court's instruction correctly and properly reflected the testimony presented at trial. Appellant's allegations in Issue 4 are not based on an accurate interpretation of the actual trial testimony, nor do they reflect the actual jury instruction given by the trial court. Accordingly, Appellant's allegations are meritless.

### 5. AGGRAVATING FACTORS

In his fifth issue, Appellant asserts that the Commonwealth presented **no** evidence in support of any of the three proffered

aggravating factors, and thus the jury's finding of the three factors was unsupported and improper. The three factors proffered by the Commonwealth and found by the jury were the following: killing committed while in the perpetration of a felony (42 Pa.C.S. § 9711(d)(6)); knowingly created grave risk of death to another person (§ 9711(d)(7)); and convicted of another murder committed either before or at the time of the murder at issue (§ 9711(d)(11)).

With regard to the last two factors, *i.e.*, subsections 9711(d)(7) and (d)(11), Appellant makes the following specific claim: because the Commonwealth failed to present any evidence during the penalty phase and also failed to incorporate any guilt phase evidence into the penalty phase, the jury's finding of these factors was not supported by any evidence. In Appellant's view, because the Commonwealth failed to make a formal motion to incorporate evidence presented in the guilt phase of Appellant's trial into the penalty phase proceedings, the jury should have been precluded from considering any guilt phase evidence during its penalty phase deliberations.

As the Commonwealth points out, there is no question that, at the beginning of the penalty phase, the prosecutor asked the jury to recognize the record, as it had been established before that same jury during the guilt phase of Appellant's trial. There is also no question that the evidence presented during the guilt phase was crucial to the jury's finding that the aggravating factors under subsections 9711(d)(7) and 9711(d)(11) were applicable. Aggravating factor 9711(d)(11) (convicted of another murder committed either before or at the time of the murder at issue) arose directly from Appellant's convictions of the first-degree murder of three individuals, which verdict had been reached by the same jury immediately before the penalty phase proceedings. Aggravating factor 9711(d)(7) (knowingly created grave risk of death to another person) arose from the guilt phase evidence concerning the manner in which Appellant carried out the murders, to wit, shooting into a group of people standing outside a bar and killing not just the two intended victims, but

also a bystander. That the Commonwealth would rely on evidence presented during the guilt phase and on the jury's guilt phase verdict to establish these two factors was clear from the prosecutor's opening statement at the penalty phase, which reads in relevant part as follows:

Now, in reaching a determination about whether or not those aggravating circumstances have been shown to you beyond a reasonable doubt[,] **we expect you to be able to recall certain evidence from the guilt[ ] phase** and that [ ] evidence can only relate to the aggravating circumstances and/or any mitigating circumstances which would apply but nothing else. **Based upon your previous verdicts of murder in the first degree** for the death of Alfred Mignogna, for the death of Frederick Rickabaugh and for the death of Stephen Heiss[,] we believe and I would submit to you that we have proven to you beyond a reasonable doubt the first aggravating factor that [Appellant] actually did commit another murder at the time of each of those offense[s]. During the trial[,] you heard about people who were outside during the shootings, you've heard from people like Mark Hott, Michael Bryant, Barb Vindel, Matt Neymeyer, and also Tonya Kline[,] and we would submit that the **evidence shown to you during the guilt[ ] phase would also apply in this phase of the trial to show you that those individuals were in grave risk of death during the shootings.** So **we don't expect you to hear any additional evidence on that aggravating circumstance**[,] but we would submit to you that we have proven it beyond a reasonable doubt.

N.T., 9/13/06, at 6 (emphases added).

In addition, the trial court, in its penalty phase charge to the jury, made clear that the jury was to rely on the facts of the case and its own guilt phase verdict during its sentencing deliberations. Specifically, with regard to aggravating factor 9711(d)(7), the court instructed the jury that "[i]t is for you to determine **from the facts of this case** whether or not [Appellant] knowingly created a grave risk of death to persons other than these victims." N.T., 9/14/06, at 41 (emphasis added). With regard to aggravating factor 9711(d)(11) (convicted of

another murder), the court instructed the jury as follows: "Now, I'm going to tell you that this aggravating factor is **based on your verdict in the guilt phase.** That's the conviction that we're talking about." *Id.* (emphasis added). Thus, not only did the prosecution clearly explain the evidence on which it was relying to establish the aggravating circumstances, but also the trial court instructed the jury that it was to rely on the facts of the case and on its guilt phase verdict in reaching its penalty phase decision.

▪ Notably, as the Commonwealth recognizes, defense counsel did not object to any of the statements discussed above: not to the method used by the prosecutor to present evidence of the aggravating factors to the jury, nor to the trial court's instructions concerning how the jury was to use that evidence in deciding upon aggravating factors. Therefore, Appellant did not preserve his current claim that the Commonwealth was required to make, and the trial court to grant, a formal motion to incorporate relevant guilt phase evidence into the penalty phase proceedings. Appellant's claim concerning aggravating factors 9711(d)(7) and 9711(d)(11) is waived.[26]

26. While from a strictly procedural point of view our disposition of this claim does not preclude Appellant from raising the matter on collateral appeal as an ineffective assistance of counsel claim, we would point out that neither statutory law nor decisional law lends any support to Appellant's assertion of an absolute requirement for a formal motion to incorporate guilt phase evidence into penalty phase proceedings. Appellant attempts to rely on 42 Pa.C.S. § 9711(a)(2), but this subsection does not even address such a motion, much less mandate one.

As further purported support for his claim, Appellant also cites *Commonwealth v. Cox*, 546 Pa. 515, 686 A.2d 1279, 1292 (1996), as "holding [that defense] counsel's belated request before [the] sentencing jury to incorporate guilt phase testimony into the penalty phase to prove mitigating circumstance [was] properly denied." Appellant's Brief at 30. However, Appellant's statement does not accurately reflect the *Cox* Court's holding.

On direct appeal, the appellant in *Cox* claimed that his trial counsel was ineffective for failing to request permission at a sidebar conference to incorporate the guilt phase testimony of a school psychologist into the penalty phase hearing to support a mitigating circumstance. Although counsel had, in fact, requested incorporation of said testimony into the penalty phase, he had done so in the presence of the sentencing jury. The trial court denied counsel's request because the school psychologist

We turn next to Appellant's assertion that the jury's finding of aggravating factor 9711(d)(6) (killing committed while in the perpetration of a felony) was not supported by sufficient evidence, indeed by any evidence, and thus was not valid. Appellant further asserts that the Commonwealth's introduction of this "false aggravator" into the proceedings resulted in a death sentence that was the product of an arbitrary factor. Appellant's Brief at 33–36 (citing 42 Pa.C.S. § 9711(h)(3), which sets forth this Court's statutory mandate to review each sentence of death).

The predicate offense proffered by the Commonwealth for aggravating factor 9711(d)(6) was illegal alien not to possess/use a firearm (18 Pa.C.S. § 6105(c)(5)), which, Appellant correctly points out, is not a felony under the Uniform Firearms Act, but rather is only a misdemeanor.[27] As a

had not testified as to any fact that would support the particular mitigating circumstance cited by counsel, to wit, 42 Pa.C.S. § 9711(e)(3). However, the court *did* permit incorporation of the *same* testimony to establish a different mitigating circumstance, to wit, 42 Pa.C.S. § 9711(e)(8), to which the testimony was relevant and supportive. *Id.* Appellant's statement of *Cox's* holding fails to acknowledge the important fact that the trial court did allow incorporation of the testimony to establish the *appropriate* mitigating factor. Thus, a full and correct reading of *Cox* does not support Appellant's claim.

A case relevant to Appellant's claim is *Commonwealth v. Wharton*, 530 Pa. 127, 607 A.2d 710, 715 (1992), in which the Commonwealth sought to establish four aggravating circumstances after the appellant was convicted of two counts of first-degree murder. During the penalty phase, the Commonwealth presented no additional evidence, but rather "rested its case on the evidence that had been presented at the guilt phase of the proceedings." *Id.* On appeal to this Court, the appellant argued that the trial court had erred by permitting the Commonwealth to incorporate evidence presented during the guilt phase into the penalty phase. *Id.* at 722. We held that the appellant's argument was frivolous, because his guilt had already been determined and the incorporation of the guilt phase evidence into the penalty phase was "purely a procedural matter." *Id.* In sum, there is no merit to Appellant's current assertion that the purely procedural matter of incorporating guilt phase evidence into the penalty phase was improper in his case.

27. The Firearms Act is the Act of Dec. 6, 1972, P.L. 1482, No. 334, effective June 6, 1973, *as amended*, 18 Pa.C.S. §§ 6101–27. The relevant provisions are as follows:

(a) **Offense defined.**—

misdemeanor, subsection 6105(c)(5) cannot support the subsection 9711(d)(6) aggravating factor (killing while in the perpetration of a felony), a conclusion with which both parties and the trial court now agree. *See* Trial Court Opinion, dated 3/14/07, at 3; Commonwealth's Brief at 37.

However, at trial, the prosecutor and defense counsel agreed to a stipulation as to the applicability of aggravating factor 9711(d)(6) grounded in a firearm charge. Well before the penalty phase, the Commonwealth had made clear its intention to establish as an aggravating factor that Appellant had committed the murders while in violation of illegal alien not to possess/use a firearm, 18 Pa.C.S. § 6105(c)(5). It is clear from the record that defense counsel agreed to the stipulation, which is reproduced below, in order to prevent the jury from learning that Appellant is an illegal alien.

> The Commonwealth and [Appellant] agree that evidence exists beyond a reasonable doubt that [Appellant] committed the killing of Alfred Mignogna, Frederick Rickabaugh, and Stephen Heiss while in the perpetration of the felony of a person not to possess and/or use a firearm. Title18 Pennsylvania Consolidated Statute Section 6105[,] a felony of the second degree.

N.T., 9/13/06, at 20.

Notably, the stipulation cited only a generic firearm felony involving possession or use, obviating the need to establish or even mention Appellant's status as an illegal alien. It appears that neither the parties nor the trial court realized that the

(1) A person ... whose conduct meets the criteria in subsection (c) shall not possess, use, control, sell, transfer or manufacture ... a firearm in this Commonwealth.

\* \* \*

(c) **Other persons.**—... the following persons shall be subject to the prohibition of subsection (a):

(5) A person who, being an alien, is illegally or unlawfully in the United States.

18 Pa.C.S. § 6105.

In the Firearms Act, a grading for the violation of subsection 6105(c)(5) is not expressly set forth; therefore, it is controlled by Section 6119, which provides that, unless otherwise specified, an offense under this subchapter is a misdemeanor of the first degree.

offense to which the stipulation actually referred was, in fact, not a felony, but rather was a misdemeanor. The Commonwealth presented no evidence as to any firearm offense, but relied exclusively on the above stipulation to establish the subsection 9711(d)(6) aggravating factor (killing while in the perpetration of a felony). The jury found three mitigating factors and three aggravating factors, one of which was subsection 9711(d)(6), and returned a verdict of death.

From these facts of record and relevant governing law, we draw the following two conclusions, discussing each in detail below. First, Appellant's challenge to the sufficiency of the evidence to support aggravating factor 9711(d)(6) must fail, based upon our well-established standard of review for sufficiency challenges. Second, Appellant made no timely objection at trial to the Commonwealth's presentation of aggravating factor 9711(d)(6), but rather stipulated to a felony in order to keep his illegal status from the jury. Hence, his claim falls under the rubric of ineffective assistance of trial counsel, which is reviewable only under collateral attack.[28]

With regard to his challenge to the sufficiency of the evidence to support aggravating factor 9711(d)(6), Appellant fails to cite or to take into account our well-established standard in reviewing the sufficiency of the evidence. We

**28.** Defense counsel did eventually file an objection to the presentation of aggravating factor 9711(d)(6), as the following sequence ascertained from the record makes clear.

The jury returned its verdict of death on September 14, 2006. On January 30, 2007, two days before Appellant's formal sentencing and more than four months after the jury's dismissal, Appellant filed a "Motion to Impose Sentences of Life Imprisonment or to Vacate the Sentences of Juries [sic] Verdicts of Death and Order that a New Penalty Phase Trial be Granted." In this motion, Appellant asserted for the first time that the predicate offense relied upon by the Commonwealth in support of aggravating factor 9711(d)(6) was a misdemeanor, not a felony. The trial court treated this motion as a post-sentence motion pursuant to Pa.R.Crim.P. 720. *See* N.T., 2/1/07, at 1–2, 4–5, and 35. The trial court conducted the sentencing hearing as scheduled on February 1, 2007, and formally sentenced Appellant to death. The trial court then conducted a hearing on Appellant's motion on February 6, 2007; following the hearing, the court denied the motion on the merits. *See* Trial Court Opinion and Order, filed 3/14/07. The trial court did not consider the matter as an ineffective assistance of counsel claim.

must determine whether the evidence admitted at trial, with all reasonable inferences drawn in favor of the Commonwealth, support the jury's finding. Importantly, we evaluate **all** evidence admitted at trial, whether or not the trial court's rulings as to admissibility were correct. *Commonwealth v. Mitchell,* 588 Pa. 19, 902 A.2d 430, 444 (2006). Thus, a challenge to the sufficiency of the evidence cannot be employed as an alternative route to obtain review of trial court or counsel error. Here, regardless of whether the stipulation was legally correct, we consider **only** if the stipulation, **as read to the jury,** constituted sufficient support for the jury's finding of aggravating factor 9711(d)(6). Because the stipulation was sufficient, Appellant's challenge to the sufficiency of the evidence must fail. Appellant's only claim in this matter sounds in ineffective assistance of counsel, which should be deferred to collateral review, as we discuss next.

Recognizing trial counsel's failure to make a timely objection to the presentation of aggravating factor 9711(d)(6), Appellant nonetheless seeks review of this matter on direct appeal pursuant to this Court's statutory review standard set forth in 42 Pa.C.S. § 9711(h)(3), which requires that we affirm a sentence of death unless we determine that

 (i) the sentence of death was the product of passion, prejudice or any other arbitrary factor; or

 (ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d).

42 Pa.C.S. § 9711(h)(3). Appellant specifically asserts that the introduction of aggravating factor 9711(d)(6) resulted in a death sentence that was the product of an arbitrary factor, and thus he argues that this Court must vacate the death sentence, pursuant to subsection 9711(h)(3).

Previously, in *Commonwealth v. Chambers,* 602 Pa. 224, 980 A.2d 35, 55–59 (2009), we declined to hold that our subsection 9711(h)(3) review encompasses a claim similar to the one that Appellant raises here. Specifically, in *Chambers,* the appellant challenged certain statements concerning the appeals process made by his penalty phase counsel during argument,

statements that allegedly led the jury to believe that it did not bear final responsibility for imposing the death penalty. Chambers argued that defense counsel's statements had injected an "arbitrary factor" into the penalty phase proceedings, resulting in a sentence that was the product of "prejudice and arbitrariness," and thereby bringing the matter within the scope of subsection 9711(h)(3). *Chambers, supra* at 55–56, 59. We declined to review Chambers's claim, holding that it was waived and unreviewable on direct appeal, but we dismissed the claim without prejudice to Chambers's right to pursue it as an ineffective assistance claim under the Post Conviction Relief Act (PCRA).[29] *Id.* at 59. In our disposition of *Chambers,* we recognized the relevance of our holding in *Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726, 738 (2002), that "a petitioner should wait to raise claims of ineffective assistance of trial counsel until collateral review." We noted that the "*Grant* rule would disappear for penalty phase claims of ineffectiveness" if an otherwise-waived counsel ineffectiveness claim were to be "available under direct appeal statutory review merely because the appellant claims that trial counsel's conduct injected an arbitrary factor." *Chambers, supra* at 59 n. 12.

Appellant's circumstances and his claim are analogous to those presented in *Chambers.* Accordingly, as in *Chambers,* we conclude that Appellant's claim with respect to aggravating factor 9711(d)(6) does not implicate an "arbitrary factor" for the purposes of 42 Pa.C.S. § 9711(h)(3). We dismiss Appellant's waived, unreviewable claim without prejudice to his right to pursue it as an ineffective assistance of counsel claim under the PCRA.

Appellant's final sub-claim in Issue 5 is that the trial court erred by not conducting a colloquy to determine if his stipulation to the 9711(d)(6) aggravating factor was knowing, intelligent, and voluntary. This claim was not preserved for review, and it is also dismissed without prejudice to Appellant's right to pursue it as an ineffective assistance of counsel claim under the PCRA.

**29.** 42 Pa.C.S. §§ 9541–46.

## 6. POST–TRIAL MOTIONS FOR A NEW TRIAL

In his sixth issue, Appellant contends that the trial court erred in denying Appellant's *pro se* and counseled motions for a new trial. Appellant's Brief at 86–92. We begin with Appellant's *pro se* motions for a new trial, in which he raised numerous allegations of error. Here, he raises three claims for review: (a) the trial court's "less terrible" mitigation instruction and related Commonwealth arguments were arbitrary; (b) Appellant was not present at proceedings where the trial court made decisions affecting his fundamental rights; and (c) the trial court erred by refusing to grant a continuance to allow the defense to complete its mitigation investigation.[30] *Id.* at 86, 88, and 89. By order filed on April 10, 2008, the trial court denied Appellant's *pro se* motions as "inappropriately filed," based on the fact that Appellant was represented by counsel throughout the proceedings, including on the date of filing of these motions. As we have already discussed in the text, *supra,* no defendant, including Appellant, is entitled to hybrid representation, and thus, because Appellant was represented by counsel at all relevant times, the trial court did not err by declining to consider Appellant's *pro se* motions on the merits.

In addition, we note that, **prior** to trial, the Government of Mexico raised sub-claim (b). The trial court addressed the matter at that time, and it denied the motion. *See* Motion of the Government of Mexico Requesting a Change of Venue to Ensure that [Appellant] Receives Due Process, a Fair Trial, and a Reliable Sentencing Determination, filed 2/10/06, at 13–14; Opinion and Order of the Trial Court, filed 5/18/06, at 6–7. Here, to this Court, Appellant explains the specific allegations in sub-claim (b) as follows:

The trial court held hearings off the record in chambers and outside the presence of [Appellant]. Although the trial

---

**30.** Sub-claim (a) was raised in Appellant's "Supplemental *Pro Se* Motion for a New Trial and Sentencing," filed 8/28/07, at 2–7. The other two sub-claims were raised in Appellant's "*Pro Se* Motion for a New Trial," filed 2/12/07, at 42–43 (sub-claim b) and 43–49 (sub-claim c). Appellant acknowledges that this motion was prepared with the assistance of a representative of the Government of Mexico. *Id.* at 6.

court called these hearings "status conferences," fundamental issues affecting [Appellant's] right to counsel, expert assistance, and a fair trial were heard and decided in his absence. In addition, the trial court's failure to transcribe these proceedings limits meaningful appellate review and the effective assistance of counsel on appeal.

Appellant's Brief at 88 (internal quotation marks and citations omitted).

The trial court addressed the matter as follows:

[W]e invited the Government of Mexico to attend periodic status conferences at which we discussed scheduling matters, and the progress of discovery in the case.

\* \* \*

In this Court's practice, status conferences are used by this Court in the management of complex cases (including death penalty cases) as a means of insuring that discovery is proceeding smoothly and that counsel receive scheduling for any anticipated motions so we can (first) achieve a trial date as quickly as possible and (second) meet that trial date. The Defendant's presence is neither indicated nor required for these ministerial matters.

Opinion and Order of the Trial Court, filed 5/18/06, at 6–7.[31]

Appellant's appeal of the matter to this Court consists of six sentences, three of which are quoted above, *see* text *supra*

---

**31.** Several documents indicate that representatives from the Mexican Consulate did indeed attend the status conferences. The Government of Mexico includes a letter from the trial judge, dated January 25, 2006, which summarizes a status conference held on January 17, 2006, and states that Fernando Trevino from the Mexican Consulate in Philadelphia was present at the meeting. The letter also states that a copy of the letter "is directed to [Mr. Trevino] confirming the nature of our discussions." Exhibit Volume accompanying the Motion of the Government of Mexico Requesting a Change of Venue to Ensure that Defendant Miguel Angel Padilla Receives Due Process, a Fair Trial, and a Reliable Sentencing Determination, filed 2/10/06, at Exhibit 44; *see also* Order of [Trial] Court, dated 2/21/06, at 2 (stating that a representative of the Government of Mexico attended the January 2006 status conference, and indicating that there would be no difficulty with the same representative or his designee being present at the next scheduled conference).

(quoting Appellant's Brief at 88), and three of which are general statements of law concerning the right to be present at one's trial. Appellant baldly asserts—with no factual explication at all—that his rights to counsel, expert assistance, and a fair trial were compromised, but we have no idea how these or any other rights were even implicated, much less negatively affected, by his absence from the ministerial conferences at issue.[32] Appellant insists that "fundamental issues" were decided in his absence, but he fails even to mention a single specific issue or decision, fundamental or otherwise. Appellant strongly implies that the trial court has mischaracterized the nature of these conferences, but such unsupported implications cannot substitute for a legally and factually developed argument. Appellant's utter failure to formulate an argument as to how the status conferences violated his constitutional rights—despite the attendance at these conferences of representatives from the Government of Mexico—indicates the total lack of merit in this claim, as the trial court has previously determined.

In the second part of Issue 6, Appellant contends that the trial court erred by denying Appellant's counseled motion for a new trial, which was grounded in social science evidence from the Capital Jury Project.[33] Appellant's Brief at 90.

The Commonwealth includes copies of two other letters from the trial judge that summarized the status conferences held on February 22, 2006, and March 9, 2006. In each of these letters, the trial judge indicates that a representative of the Mexican Consulate was present at the meeting, specifically, Rocio Alvarez and Fernando Trevino, at the February and March meetings, respectively. *See* Commonwealth's Brief, Exhibits 4 and 5.

32. In its orders of January 13, 2006, and March 3, 2006, the trial court authorized the appointment and payment of a former state trooper as a defense investigator, of a defense mitigation expert, and of an additional defense expert. Although Appellant includes a general, unexplained complaint about his right to expert assistance, he fails to mention these trial court orders or these appointed defense experts. He does not even suggest the nature of the expert assistance he was allegedly denied.

33. As defined in its home website, the Capital Jury Project is "a program of research on how persons who serve as jurors on capital cases make the life or death sentencing decision." http://www.albany.edu/scj/13189.php. The Project, which is located in the School of

Based on published findings from researchers associated with the Capital Jury Project, Appellant raises three claims: (1) death qualification creates juries that are predisposed toward the prosecution and a sentence of death; (2) separate juries for guilt and penalty phases of trial are required in order to avoid the bias inherent in death qualification; and (3) juries often do not understand the court's instructions and therefore misapply the law concerning the determination and weighing of aggravating and mitigating factors. Appellant cites no evidence or events from his own trial to support any of these claims. Rather, Appellant derives his assertions entirely from the published research studies of the Capital Jury Project, which based its conclusions on interviews with individuals who had served on capital juries in fourteen states, including Pennsylvania.

The trial court found the Capital Jury Project conclusions "academically interesting," but consistent with neither the law of this Commonwealth, nor the court's experience. Opinion and Order of the Trial Court, filed 6/30/06, at 4. The trial court expressed strong disagreement with the claims that death-qualified jurors were predisposed to impose the death penalty, unable to separate the actual determination of guilt from the penalty phase, or unlikely to consider mitigation evidence. Most seriously, the trial court suggested that, if the court were to adopt these defense claims, it would "repudiate the jury system as it has traditionally existed." *Id.* at 6. The trial court also noted that separate juries for the guilt and penalty phases are required neither by the Pennsylvania nor by the United States Constitution; furthermore, the interests of judicial economy do not support separate juries because, in most cases, this would effectively require two separate trials with many of the same facts. *Id.* at 5–6. The trial court concluded that Appellant's assertions were nothing more than assumptions and speculation. *Id.* at 5.

We agree with the trial court's analysis. Appellant has not formulated or advanced a specific claim that the jury in **his**

Criminal Justice at the University of Albany, comprises a consortium of university-based researchers.

case was predisposed toward the death penalty or did not understand the court's penalty phase instructions. Rather, through reliance on the published studies and conclusions of a group of social scientists, Appellant seeks a general, major change in the policy and the statutes related to the death penalty in this Commonwealth. Such issues are more appropriately directed to the General Assembly. Appellant is entitled to no relief on his sixth issue.

## 7. STATUTORY REVIEW

Finally, pursuant to 42 Pa.C.S. § 9711(h)(3), we must review a sentence of death and affirm, unless we determine that

 (iii) the sentence of death was the product of passion, prejudice or any other arbitrary factor; or

 (iv) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d).

42 Pa.C.S. § 9711(h)(3).

Following review of the facts and the record, we conclude that the sentence of death was not the result of "passion, prejudice, or any other arbitrary factor," but rather was based on the evidence admitted at trial. *Id.* In addition, as discussed in Issue 5, we conclude that the evidence admitted at trial was sufficient "to support the finding of at least one aggravating circumstance." *Id.; see Chambers, supra* at 59–60. The verdict and sentence of death are hereby affirmed.[34]

Chief Justice CASTILLE and Justices EAKIN and STEVENS join the opinion.

Chief Justice CASTILLE files a concurring opinion in which Justice EAKIN joins.

Justice SAYLOR files a concurring and dissenting opinion in which Justice TODD joins.

Justice BAER files a concurring and dissenting opinion.

**34.** The Prothonotary of the Supreme Court is directed to transmit the complete record of this case to the Governor of Pennsylvania. *See* 42 Pa.C.S. § 9711(i).

Chief Justice CASTILLE, concurring.

I join the Majority Opinion and write separately to address the penalty phase issue that divides the Court, concerning the stipulation to the in-the-perpetration-of-a-felony aggravating circumstance, 42 Pa.C.S. § 9711(d)(6). In addition, I write to note the strange fact that the Federal Community Defender's Office ("FCDO"), an outfit funded by U.S. taxpayers' dollars, entered an appearance on behalf of the sovereign government of the United Mexican States ("Mexico"), and in that capacity wrote and filed an *amicus curiae* brief in support of appellant.

## I.

### A.

Having been a trial lawyer for many years, I have a developed partiality to facts. The experience has proved helpful in the craft of appellate judging: many issues that are initially presented as pristine questions of law, involving matters of great legal moment, melt away when measured by the record facts. The disputed penalty phase issue here presents just such a case.[1]

1. Mr. Justice Baer's Concurring and Dissenting Opinion suggests that my expression of view in this opinion is a "criticism" of Mr. Justice Saylor's Concurring and Dissenting Opinion and implies that Justice Saylor "is ignoring the facts of the case to address a legal princip[le.]" Concurring and Dissenting Opinion (Baer, J.), Op. at 540, 80 A.3d at 1292. This is not at all so. This opinion, which proceeds in several parts and along several tracks, in fact discusses the "pristine question of law," as it has been forwarded by appellant's counsel. In assessing that question, I have considered the illumination that I believe is found in the record, including what emerged post-trial, the trial court's opinion, and the response of the Commonwealth, and I explain why I believe this waived claim—whatever may be its ultimate merit—is properly suited for collateral attack. Moreover, I do not read Justice Saylor's Concurring and Dissenting Opinion as necessarily expressing agreement or disagreement with the specific manner in which appellant casts his claim. As I read Justice Saylor's Concurring and Dissenting Opinion, which explains why he believes that statutory penalty phase relief is warranted, his opinion is cast responsively to points made in the Majority Opinion, affirmatively in terms of Justice Saylor's own view of our precedent on salient points, and then affirmatively again in light of his view of the Commonwealth's responsibilities in light of the

The most important fact necessary to properly understand the issue before this Court is that appellant is a Mexican national who was residing in the United States illegally at the time of these murders in August 2005. Appellant murdered three men, and received three death sentences. The facts below demonstrate that Appellant, his friend Travis Shumaker, and Shumaker's mother were denied admission to a private social club. During the course of an argument and altercation involving Shumaker and the club's owner, Alfred Mignogna, and bouncer, Frederick Rickabaugh, appellant walked to Shumaker's nearby car, retrieved a loaded handgun, returned, and fired repeatedly, killing Mr. Mignogna, Mr. Rickabaugh, and a bystander and patron of the club, Stephen Heiss. In doing so, appellant also risked the lives of other club attendees. The jury found three aggravating circumstances as to each murder, two of which are very powerful: multiple murder, 42 Pa.C.S. § 9711(d)(11), and knowingly creating a grave risk of death to other victims, 42 Pa.C.S. § 9711(d)(7), with the third aggravator being that appellant committed the murders in the course of a felony involving the illegal possession of firearms. 42 Pa.C.S. § 9711(d)(6). Appellant had no real defense against the first two aggravators, and his counsel insisted upon stipulating to the third for a very specific reason: so that the jury would not learn appellant's status as an illegal alien. The jury also found three mitigating circumstances, two implicating the "catchall" mitigator of "any other" relevant mitigation (here, that appellant was a good father and made a positive adjustment to incarceration), 42 Pa.C.S. § 9711(e)(8), and a third relating more directly to the offenses, *i.e.*, that he was under the influence of extreme mental or emotional disturbance when he committed the three murders. 42 Pa. C.S. § 9711(e)(2). Not surprisingly in a case involving three murders, the jury unanimously found that the aggravators outweighed the mitigators as to all three murders, and thus it returned three sentences of death, as required. 42 Pa.C.S. § 9711(c)(1)(iv).

Because appellant is an illegal alien, he cannot lawfully secure a license to possess firearms in Pennsylvania. And so,

record and the manner in which the aggravator was actually pursued at trial.

when appellant went to Shumaker's vehicle and retrieved the gun, he violated the Uniform Firearms Act, 18 Pa.C.S. §§ 6101–6127. Section 6105 of the Act prohibits possession of a firearm by any person "who, being an alien, is illegally or unlawfully in the United States." 42 Pa.C.S. § 6105(a), (c). As the Majority Opinion notes, no specific grading for a Section 6105 offense is set forth in the Act. Therefore the default grading of Section 6119 applies: "Except as otherwise specifically provided, an offense under this subchapter constitutes a misdemeanor of the first degree."

But, of course, appellant was not an illegal alien who merely possessed a firearm: he also carried it and used it to murder three people. As the Commonwealth and the trial court note, that conduct implicated Section 6106 of the Act, which provides as follows:

(a) Offense defined.—

(1) Except as provided in paragraph (2), any person who carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license under this chapter commits a felony of the third degree.

(2) A person who is otherwise eligible to possess a valid license under this Chapter but carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license and has not committed any other criminal violation commits a misdemeanor of the first degree.

Appellant raised no contemporaneous objection to the felony aggravator stipulation his counsel insisted upon, thus waiving any claim respecting its propriety or content. The claim now before the Court was first raised some months after trial. Notwithstanding that the claim had been waived, the trial court, per the Honorable Hiram A. Carpenter III, diligently and carefully examined the issue—which does not, as appellant would have it, implicate the simple circumstance of a jury

accepting a stipulation to a non-existent aggravating circumstance. In other words, it is not as if the jury was erroneously told that the adult victims here were children under the age of twelve. *See* 42 Pa.C.S. § 9711(d)(16). Rather, the defaulted issue involves the Commonwealth's notice of aggravating circumstances, the notice's relationship to the prior criminal information, and whether that relationship could have formed the basis for dismissal of the aggravator, a challenge appellant never raised. Judge Carpenter's account of the actual defaulted issue is illuminating and explained: why the Section 6106 felony firearms provision was properly the basis for the aggravator; that proof of a violation would entail informing the jury that appellant was an illegal alien; that appellant's counsel, as a strategic matter, wished to avoid disclosure of appellant's illegal alien status, apparently at all costs; and that it was appellant who both secured severance of the formal firearms charge for trial and insisted upon a generic stipulation to the firearms penalty aggravator, precisely so the jury would not learn that he was an illegal alien:

> [T]he Commonwealth could establish the [felony] aggravator by demonstrating that [appellant] (1) "carried a firearm in a vehicle" to the parking lot and/or "carried a firearm concealed on or about his person" the few yards from his car to the scene of the shootings at a time when [appellant] was without a "valid and lawfully issued license." Proof of this last element would involve demonstrating that [appellant] could not be a validly and lawfully licensed individual *because he was an illegal alien.* Thus, [appellant's] status as an illegal alien improperly in possession of a firearm *was* available to the Commonwealth (graded as a felony) to support the aggravator....

Of course, no argument was ever made to the penalty phase jury that [appellant] was an illegal alien improperly in possession of a handgun under either 18 Pa.C.S.A. 6105(c)(5) or 18 Pa.C.S.A. 6106(a)(1). Instead, Defense counsel entered into a generic stipulation that [appellant] *"was* guilty of a felony possession charge under the Firearms Act

during the homicides." That generic stipulation satisfied the aggravator.

While this is not a PCRA proceeding, it is important to understand how the Defense's awareness of the Commonwealth's intention to pursue the fact that [appellant] was an illegal alien in possession of a weapon in support of the aggravator impacted the Defense. Throughout their representation, Defense counsel was concerned that [appellant's] status as an illegal alien be kept from the jury to the maximum extent possible. As early as the Omnibus Pretrial Motions, the Defense asked this Court to sever [the formal firearms charge under Section 6105] from the information claiming possible prejudice. In response, on June 30, 2006, we authored a fourteen (14) page Opinion severing [the firearms charge] from the triple homicide trial and ordering it to be tried separately. Accordingly, the "trial" jury would never know [appellant] was an illegal alien. However, our June 30th ruling did not address the penalty phase beyond preserving [the firearms offense] re the aggravator.

On the first day of our jury trial, penalty phase counsel ... adopted a strategy designed to keep [appellant's] illegal alien status out of any penalty phase as well. On that date ..., [counsel] filed a Motion with the Court requesting an Order precluding the Commonwealth from entering into evidence in the penalty phase [appellant's] illegal alien status. In support of that position, [counsel] contended in the Motion that to establish the aggravator the Commonwealth only needed to show [that appellant] had committed a felony in his possession or use of a firearm at the time of the homicide. The Defense offered a stipulation to that effect. Further, the Defense requested that the Court *require* the Commonwealth to accept the stipulation to avoid the inevitable prejudice which the Defense argued would result from the Commonwealth's proof of the specific felony supporting the aggravator. We never ruled on that request because the Commonwealth accepted the stipulation. Presently, because of the "error" in [the fact that the informa-

tion referred only to the misdemeanor firearms offense in Section 6105, and the stipulation adverted to Section 6105 as well], the Defense questions its own action since their proffered stipulation became the "vehicle" which allowed the "improper aggravator" to be found by the penalty phase jury.

Trial Ct. Slip Op., 3/14/07, at 7–8 (emphases in original). On these facts and circumstances, I do not see how appellant can be entitled to summary penalty phase relief.

### B.

The Court is divided on the issue of whether the allegedly incorrect stipulation to the course of a felony aggravating circumstance is reviewable on direct appeal notwithstanding its waiver, or if the question should be deferred for collateral review under the PCRA.[2] The Majority Opinion outlines appellant's argument, and then rejects it as a matter of law via application of *Commonwealth v. Chambers*, 602 Pa. 224, 980 A.2d 35 (2009), without examining the views and account of the Commonwealth and the trial court in great detail. My own review of those presentations shows illuminating additional reasons why deferral of this claim is appropriate, as against an argument that this case differs critically from *Chambers* and warrants a relaxation of waiver principles pursuant to this Court's statutory review power.

I begin by noting that it is difficult to imagine how a claim based upon evidence or facts that were the subject of the parties' stipulation provides the basis for an issue subject to valid direct appellate review. If a party has a problem with a stipulation, it need not, indeed it should not, stipulate; it certainly should not insist upon the stipulation, as occurred here. No objection was raised to the stipulation until months after the trial, at a point where nothing could be done about it. Assuming for the moment that the stipulation was deficient, and to appellant's detriment, his counsel obviously should have taken some action at a point where the trial court and the

2. Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541–9546.

Commonwealth could have responded. It may be that the problem, if timely identified, could have been addressed, and the outcome would be no different (indeed, that is most likely the case here). Of course, the prosecution in a capital case bears responsibility for the aggravators it pursues. But, prosecutors make honest mistakes, no less than defense lawyers do. Furthermore, there can be complications, or confusion, or misunderstandings that do not even amount to a mistake, much less some nefarious plot by the prosecution. Many errors and pitfalls are possible in a case; ours is an adversarial trial system, with a neutral judge as arbiter, and the requirement of contemporaneous objection operates to avoid error, and to create a record to allow for meaningful appellate review. It also operates to discourage intentional building-in of error.

## C.

Obviously, there is nothing to prevent appellant from litigating his defaulted issue respecting the stipulation as a claim of ineffective assistance of counsel under the PCRA; since his own counsel demanded the stipulation, the focus obviously should be upon the conduct of counsel, which is a classic collateral issue. But, appellant's very capable appellate counsel realizes that there is nothing to be lost, and summary relief perhaps to be gained, from seeking to have the defaulted claim deemed reviewable on direct appeal via invocation of our statutory review of death sentences for passion, prejudice or arbitrariness. *See* 42 Pa.C.S. § 9711(h)(3). Direct review spares an appellant the need to account for his trial attorney's conduct, freezes the record at a point where necessary factual development may not have occurred, lowers the appellant's burden to prove error (if a trial court can ever be said to have "erred" when a claim has been waived), and shifts the prejudice burden to the Commonwealth. And, it is even better if the defaulted claim implicates an aggravating circumstance because the appellant can invoke—as appellant has here—this Court's unexplained and unsupported declaration in *Commonwealth v. Williams*, 539 Pa. 61, 650 A.2d 420, 430 (1994), that,

where an aggravator is "struck down" on appeal in a case where the jury engaged in a weighing of aggravators and mitigators, a new penalty phase is required.[3] The existence of *Williams* provides a powerful incentive to cast penalty phase claims a certain way; and indeed, it provides an unintended incentive for intentional error building by the defense at trial. That is not to say there in fact was error-building by the defense here; the point is that the *Williams* decision incentivizes it, few if any lawyers would admit to the practice, and the Court should be aware of the consequences when issuing unexplained *per se* rule pronouncements.

To be clear, I do not criticize appellant's counsel for taking this tack: this is creative advocacy. The best appellate advocates on the criminal defense side look to burdens of proof and levels of prejudice as a way to cast their claims. It is always better to have a claim considered directly, rather than through the rubric of counsel ineffectiveness, and this is especially so where a *per se* rule like *Williams* appears to be available. Even where a claim can only sound in counsel ineffectiveness, this Court recently has seen a relative proliferation of claims that seek to expand definitions of structural error, for example, so as to avoid a defense burden to prove *Strickland*[4] actual prejudice. *See, e.g., Commonwealth v. King,* 618 Pa. 405, 57 A.3d 607 (2012) (on collateral attack, defendant alleged that trial counsel's lack of experience amounted to constructive denial of counsel implicating structural error, and warranting presumption of prejudice); *Commonwealth v. Mallory,* 596 Pa. 172, 941 A.2d 686 (2008) (on collateral attack, defendants alleged that ineffectiveness claim involving counsel's failure to request on-record, oral jury waiver colloquy implicated structural error, warranting presumption of prejudice).[5] And, it is always tempting for appellate courts to adopt presumptions or

**3.** I further discuss the difficulties with the *Williams* decision in Part I(E) *infra.*

**4.** *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**5.** Not coincidentally, appellant makes just such a claim in this case, alleging that his counsel had "debilitating conflicts of interest" which warrant a conclusion that he was constructively denied counsel.

*per se* rules rather than to take on the harder task of individualized appellate judging.

The deferral of this defaulted claim to collateral review is consistent with, if not commanded by, this Court's precedent. Not coincidentally, all of the recent relevant precedent respecting waived issues has arisen in cases where the appeal was litigated by appellant's current lead counsel. Thus, in *Chambers, supra,* counsel unsuccessfully sought to invoke statutory death penalty review to litigate a claim properly sounding in ineffectiveness on direct appeal; this Court deferred the claim to PCRA review. More recently, in *Commonwealth v. May,* 612 Pa. 505, 31 A.3d 668 (2011), counsel invoked statutory review in an attempt to litigate numerous waived penalty phase claims including, as here, alleged misconduct by the prosecutor (involving not an aggravator in that case, but the prosecutor's closing argument), as well as claims implicating the trial court's penalty phase charge, and the fact that the defendant was shackled. Each occurrence, the defendant argued, was reviewable on appeal despite the lack of contemporaneous objection, because the events supposedly implicated our statutory review for passion, prejudice, or arbitrariness. The Court, in a unanimous opinion by Mr. Justice Eakin, rejected the effort:

> Appellant fails to acknowledge that these issues were never objected to below and presumptively fall under the rubric of ineffective assistance of counsel. "[A]s a general rule, a petitioner should wait to raise claims of ineffective assistance of trial counsel until collateral review." *Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726, 738 (2002). In *Commonwealth v. Chambers,* 602 Pa. 224, 980 A.2d 35 (2009), we declined to review waived issues that derived from strategic decisions of the defendant's trial counsel under the guise of an "arbitrary factor" for the purposes of 42 Pa.C.S. § 9711(h)(3)'s statutory review. *Chambers,* at 58–59.

> Although appellant acknowledges this Court's recent decision in *Chambers,* he baldly asserts this case is distinguishable.... All of appellant's claims involve instances that

could have been objected to by trial counsel. For instance, the prosecutor's labeling of appellant's mitigating evidence as excuses could have been objected to immediately following the prosecutor's comments. The trial court then would have had the opportunity to sustain the objection and issue a charge. Having failed to object, appellant must now defer these issues to collateral review as ineffective assistance of counsel claims.

31 A.3d at 675–76 (footnotes omitted). Here, as in *May*, appellant's trial counsel could have objected to the stipulation—or more to the point, he could have declined to demand that the Commonwealth agree to stipulate. Also, to the underlying point, which is simply assumed by the claim as posed here, counsel could have challenged the propriety of the aggravator, notwithstanding that appellant's conduct obviously implicated the Section 6106 felony. Presumably, any such timely argument along those lines would be premised upon a position that there was something in the law and the facts of this case to prevent the Commonwealth from moving on that felony aggravator (I will further address this point in Part I(D), *infra*). Whether there was a strategy leading to the non-action, and what would have happened if counsel had acted (including the question of whether the aggravator was proper in the first place, and whether the ultimate outcome would still have been a stipulation, so that the jury would not learn that appellant is an illegal alien), depends upon factual development. This circumstance does not, however, make for a ready appellate issue, much less a *per se* grant of a new penalty phase.[6]

6. Justice Baer's Concurring and Dissenting Opinion takes issue with the analysis of the trial court and the Commonwealth that I have outlined concerning the Section 6106 felony, arguing that the facts at trial—a trial where Section 6106 was not specifically at issue—do not prove the offense since it was not shown at that level that appellant carried the firearm either in the vehicle or concealed on his person. (Notably, appellant has not argued this in response to the Commonwealth and the trial judge, preferring instead his "pristine question of law"). At the same time, however, Justice Baer recognizes the obvious fact that, put to proving the felony—for example, by a timely objection or challenge to the aggravator—the Commonwealth may well have produced more specific evidence addressing the elements of that crime. Justice Baer

Appellant also relies heavily on *Commonwealth v. Boczkow-ski*, 577 Pa. 421, 846 A.2d 75 (2004), but that case is materially distinguishable. In *Boczkowski*, the jury found one aggravating circumstance—that the appellant had been convicted of another murder, 42 Pa.C.S. § 9711(d)(11), which occurred in North Carolina—and one mitigating circumstance—evidence respecting the appellant's character, falling within the catchall mitigator. 42 Pa.C.S. § 9711(e)(8). The jury determined that the single aggravator outweighed the single mitigator, and thus returned a sentence of death. 42 Pa.C.S. § 9711(c)(1)(iv). The appellant had moved to quash the aggravating circumstance pretrial, on grounds that the death eligibility circumstance had been secured only by the Commonwealth's violation of a pre-trial court order staying his extradition to North Carolina for trial on the prior murder until the Pennsylvania murder trial had concluded. On appeal, the appellant argued that the Commonwealth had no authority to contravene the order; that its conduct in transferring him to North Carolina created the single aggravating circumstance that made him death penalty eligible; that the Commonwealth should not benefit from its violation of a court order; and that quashal of the aggravating circumstance and vacatur of the death sentence it produced were appropriate. In response, the Commonwealth did not dispute that its action led to the creation of the aggravating circumstance, but argued that it was not deliberately seeking to create that aggravating circumstance; that it acted in good faith; that the aggravator existed when the matter ultimately was ready for trial; and that absent a showing of "purposeful abuse" by prosecution authorities, the aggravator should not be set aside. In resolving the merits of this preserved claim in favor of the appellant, the *Boczkowski*

then states that "it is wholly improper to assume or infer the existence of the felony to justify the aggravating circumstance." Concurring and Dissenting Opinion (Baer, J.), at 542, 80 A.3d at 1238. Respectfully, it is difficult to see how this argument weighs against deferral of the claim, which is my primary point. The fact remains that the aggravator was supported by stipulation; the stipulation was entered into upon insistence by the defense; no objection was raised to the aggravator or the stipulation; and a proper and accurate disposition of the waived claim, in my view, is better left to collateral attack.

Court looked to the statutory review standard, and concluded that "this sentence of death cannot stand under Section 9711(h)(3)(i)'s proscription against sentences that are the product of passion, prejudice or any other arbitrary factor." 846 A.2d at 100–01.

Thus, the penalty phase claim at issue in *Boczkowski* was preserved at trial, and statutory review was not invoked to relax or eliminate issue preservation principles (and to secure a more favorable level and standard of review), or to avoid having to litigate a defaulted claim through the guise of ineffective assistance of counsel and a fully developed factual record. Rather, this Court adverted to the statutory review factors only to assess the merits of the preserved issue. To be on all fours with *Boczkowski*, the record here would have to show that the trial court, over objection, permitted the Commonwealth to pursue an aggravating circumstance that never actually existed, or that was not properly in the case to begin with. The record here shows no such thing; thus, in my view, the Majority Opinion's application of the *Chambers* line of decisions is appropriate.[7]

### D.

This is not to say that the facial aspect of the claim as cast on appeal is not problematic. It is. But, this is where the Commonwealth's brief and the trial court's opinion provide

---

7. The recent proliferation of cases where capital defendants seek to invoke statutory review of the penalty as a means to revive claims that were defaulted below raises a broader question. This particular review requirement dates to 1978, soon after the reinstitution of capital punishment in America, at a time when states were left to guess at what sort of review systems might be deemed constitutional in the wake of the effective suspension of capital punishment resulting from *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). The decisional law issuing from the U.S. Supreme Court since that time has imposed a series of requirements that address the fractured *Furman* Court's concerns with unbridled and arbitrary sentencing power being reposed in a capital sentencer. Appellate court review for supposed "passion, prejudice and arbitrariness" in death penalty cases proceeding according to these more recent extensive Eighth Amendment guidelines has little logical place; the General Assembly may want to consider whether it has any proper current role. I will explain my concerns in this regard in greater depth in a more appropriate case.

some illumination, which makes the case for deferral to PCRA review stronger.

The Commonwealth relates that it provided notice to appellant that the third aggravator was that appellant "committed the killing while in the perpetration of a felony." The Commonwealth then notes that appellant's current claim is premised upon the fact that the earlier criminal information—not the notice of aggravators—charged him with violating the Section 6105(c)(5) "person not to possess/use a firearm—illegal alien" misdemeanor. The Commonwealth next correctly identifies the factual predicate of appellant's claim as alleging that the information's citation to the (c)(5) misdemeanor limited the Commonwealth to pursuit only of that firearms offense, and since that offense is a misdemeanor, the perpetration-of-a-felony aggravator ceased to exist. Leaving aside the merits of such a claim for the moment, that is certainly an argument appellant's trial counsel could have made, instead of demanding the stipulation. The Commonwealth's core position on appeal, and the trial court's analysis, dispute that necessary predicate.

In the Commonwealth's view, it "is not limited, in this instance, to the charge set forth in the information to establish the aggravator." Rather, the key question is whether the aggravator that the Commonwealth identified to appellant in fact existed: "did [appellant] commit the killing while in the perpetration of a felony." The Commonwealth says the answer is yes, because appellant's conduct implicated not only the Section 6105(c)(5) misdemeanor listed in the information, but also implicated Sections 6106(a)(1) and 6109(e)(1)(x). The Commonwealth then explains:

> Both of the aforesaid sections prohibited [appellant] from carrying or possessing a firearm. Even if Section 6105(c)(5) is not a felony, ... Section 6106(a)(1) clearly is a felony. Therefore, although not charged in the information, [a]ppellant, being an illegal alien, committed a felony in violation of the Firearms Act. (*See* 18 Pa.C.S.A. Section 6109(e)(x) as the same applies to Section 6106(a)(1) of the Act). The fact that the action of [appellant] constituted a felony is the

aggravator that the Commonwealth noticed in this matter. Thus, the aggravator that the Commonwealth noticed, did exist.

Commonwealth's Brief at 38. The Commonwealth then adds that appellant stipulated that he committed the killings while in the perpetration of a felony involving the illegal use of a firearm, and this was all that the jury was told.

The Commonwealth goes on to note that, if appellant's actions in fact comprised a violation of Section 6106(a)(1), which was a felony—and, the Commonwealth says, his actions did—then the jury's finding of the aggravator was supported by the stipulation. Moreover, the stipulation was "factually and legally accurate," according to the Commonwealth, even if the stipulation wrongly cited Section 6105(c)(5):

The fact that the stipulation cited Section 6105(c)(5) of the Firearms Act does not negate the Commonwealth's argument.... The citing of a statutory number to the jury would have meant nothing to them since the entire statute was not read to them for definition. The jury was also not told of the specific facts that gave rise to the felonious conduct of the [a]ppellant (that he was not permitted to have the firearm because he was an illegal alien). They were simply given a stipulation that the killing was in the perpetration of a felony regarding the Firearms Act. Once again, that stipulation was consistent with Section 6106(a)(1) which is, in fact, a felony. Therefore, the inclusion of a numerical cite of the subsection of the Firearms Act referred to in the stipulation can be no more than harmless error, if any.

Thus, the Commonwealth noticed the aggravator of "Defendant committed the killing while in the perpetration of a felony". The evidence before the jury was the stipulation that [appellant] committed the killing while in the perpetration of a felony involving the illegal possession of a firearm. A review of the verdict slip unequivocally evidences the fact that is exactly what the jury found.

Further there is no requirement that a defendant be charged with either of the aforesaid sections of the Fire-

arms Act in order for the aforesaid aggravator to exist. The Commonwealth was not required to specifically charge [appellant] with Section 6106(a)(1) for said aggravator to be legitimately placed before the jury.

*Id.* at 38–39.

The lower court likewise approached the substantive core of the defaulted issue as one implicating notice of the aggravator. The court found that the felony aggravator was properly supported by the facts, that the issue was essentially one of notice of the aggravator, that the notice was sufficient notwithstanding that the criminal information referenced the misdemeanor offense, and that appellant had good reason to stipulate, even if counsel did not realize that the felony involved Section 6106(a)(1): both the felony and the aggravator turned on the fact that appellant was an illegal alien, and counsel's trial strategy included a determination not to have that status revealed to the jury. The court explained that Pennsylvania Rule of Criminal Procedure 802 requires the Commonwealth in a capital case to file, and provide to the defense, a notice of the aggravating circumstances it intends to pursue at sentencing. The notice is generally required "at or before the time of arraignment." Here, the court noted, "Rule 802 was followed to the letter."

Notice was provided to the Defense at arraignment of the aggravator at issue as well as two other aggravators the Commonwealth intended to submit to the penalty phase jury. The language used by the Commonwealth in providing notice quoted the required statutory language as to each aggravator exactly. There is no possibility of confusion on the part of the Defense that it was the Commonwealth's intention to pursue as one of their aggravating circumstance that [appellant] committed the killing in the perpetration of a felony.

Once that inescapable conclusion is reached, it becomes clear that the Defense Motion is not founded on a violation of the existing Rules. Instead, the Defense asks the Court to expand the Rules and impose on the Commonwealth the additional duty to notice the Defendant as to the *specific*

*felony* the Commonwealth intends to demonstrate *in the information.* While we can agree the information has some importance on the notice issue, neither Rule 802 nor case law support that position. In fact, the law regarding notice is much more relaxed.

Trial Ct. Slip Op., 3/14/07, at 4 (emphasis in original). After discussing decisional law from this Court concerning proper notice of aggravating circumstances,[8] Judge Carpenter carefully explained why he did not believe there was a legitimate notice issue that appellant's counsel could have raised:

First, the Commonwealth in the Notice of Aggravating Circumstances noticed the aggravator it intended to prove in the exact language of the statute. Second, based on [the criminal information,] the Defense knew that the Commonwealth intended to demonstrate that the particular felony supporting the aggravator was based on [appellant's] status as an illegal alien not to possess a handgun during the murders. While this additional notice was not required, it was clearly provided. The only thing not apparent was that [appellant's] status would be shown to the jury not under 18 Pa.C.S.A. 6105(c)(5) as charged but rather under 18 Pa. C.S.A. 6106(a)(1) and (2). . . .

*Id.* at 6. The court then explained why it believed the Section 6106 offense was supported by the facts: I have quoted that analysis at the outset of this opinion.

It would be one thing if trial counsel had insisted upon a stipulation to an aggravator that the Commonwealth could

**8.** The trial court cited the unanimous decision in *Commonwealth v. Edwards*, 588 Pa. 151, 903 A.2d 1139 (2006), a case which relied upon *Commonwealth v. Carson*, 559 Pa. 460, 741 A.2d 686 (1999), *cert. denied*, 530 U.S. 1216, 120 S.Ct. 2220, 147 L.Ed.2d 252 (2000). In *Edwards*, the notice claim was premised upon the fact that the Commonwealth did not cite the appropriate subsection of the death penalty statute governing the multiple murder aggravating circumstance. In rejecting the claim, the *Edwards* Court noted that the purpose of Rule 802 is merely to provide the defense with sufficient time and information to prepare for the sentencing proceeding. The Court noted that our decisions "reveal a central theme: where the defendant has constructive notice of the aggravators due to the crimes charged, we have found no prejudice resulting from the Commonwealth's failure to provide timely or accurate notice." 903 A.2d at 1161.

never prove, such as that the adult victims here were children. But, it is another thing entirely where, as here, the Commonwealth actually asserted timely that it could, in fact, prove the aggravator, and what is at issue is a belated claim on appeal built upon questionable assumptions about the effect that a charging document, and a citation error, has upon the Commonwealth's ability to notice, and prove, statutory aggravators. Appellant's trial-level counsel could have raised a notice objection, or a claim that the criminal information somehow trumps Rule 802; he likely would have lost. And then, in all likelihood, faced with the certain knowledge that the Commonwealth could prove the Section 6106 felony by showing that appellant was an illegal alien, counsel would have demanded the same stipulation, so that the jury would not learn his client's status as an illegal alien. It is not clear that there is a meritorious issue properly of record here, defaulted below but resurrected on appeal because the penalty phase proceeding was supposedly infected by arbitrariness in the form of an illegitimate aggravator. Any claim must focus upon the decisions and actions of counsel, and should be pursued under the PCRA.

Facts are inconvenient to some claims. The facts here show that a summary award of penalty phase relief to this triple murderer would represent the height, or rather the depths, of arbitrariness.

### E.

Speaking of arbitrariness, since the case here for the *per se* award of the windfall of a new penalty phase is premised solely upon this Court's decision in *Commonwealth v. Williams*, 539 Pa. 61, 650 A.2d 420 (1994), I will address some concerns with that decision. Appellant accurately cites *Williams* for the proposition that, where an aggravator is "struck down" on appeal in a case where the jury engaged in a weighing of aggravators and mitigators, a new penalty phase is required. Here is the entirety of the relevant discussion in *Williams:*

Since the sentencing jury improperly heard evidence on aggravating circumstance 9, their finding with regards to that aggravating circumstance is insupportable and a new sentencing hearing will have to be conducted. Where we strike down an aggravating circumstance and other aggravating circumstances are present along with a finding of a mitigating circumstance, we are not in a position to determine whether the lack of the aggravating circumstance struck down would have changed the jury's determination and, pursuant to 42 Pa.C.S. § 9711(h)(4), we are required to vacate the penalty of death and remand for a new sentencing hearing.

*Id.* at 430. *Williams* cited no authority for the significant legal proposition that prejudice cannot be assessed in this circumstance, or the derivative assumption that varying factual paradigms can make no difference. The only authority cited, 42 Pa.C.S. § 9711(h)(4), is a procedural provision, directing that, "[i]f the Supreme Court determines that the death penalty must be vacated because none of the aggravating circumstances are supported by sufficient evidence, then it shall remand for the imposition of a life imprisonment sentence. If the Supreme Court determines that the death penalty must be vacated for any other reason, it shall remand for a new sentencing hearing pursuant to subsections (a) through (g)." The "any other reason" determined by the *Williams* Court was the naked proposition that, "we are not in a position to determine whether the lack of the aggravating circumstance struck down would have changed the jury's determination."

*Williams* is problematic, setting forth a holding unsupported by constitutional or statutory authority, and doing so with not so much as a syllable of legal reasoning. The holding is both dubious and counter-intuitive. Imagine a mass murderer (one who murders more people than appellant did in this case) with, say, one additional relatively minor aggravator, such as the in-the-perpetration-of-a-felony aggravator here, and a single mitigator. If the felony aggravator were to be "struck down" on appeal, are we really to accept that it is impossible

to assess prejudice? *Williams's* unexplained proposition is particularly dubious given the subsequent experience of Pennsylvania courts in determining penalty phase prejudice, primarily in cases posing claims of counsel ineffectiveness. *See, e.g., Commonwealth v. Gibson,* 610 Pa. 332, 19 A.3d 512 (2011); *Commonwealth v. Lesko,* 609 Pa. 128, 15 A.3d 345 (2011). That task requires assessment of whether there is a reasonable probability that the outcome of the proceeding would have been different, which is little different from assessing "whether the lack of the aggravating circumstance struck down would have changed the jury's determination"—the determination the *Williams* Court assumed was impossible. Courts assess penalty phase prejudice all the time.

Appellant cites no case since *Williams,* and my research has revealed none, which has stepped into the void and provided any developed reasoning in support of the bald proposition stated by *Williams.* The only other case appellant cites, *Commonwealth v. Wesley,* 562 Pa. 7, 753 A.2d 204, 213–14 (2000), quotes *Williams verbatim.* The U.S. Supreme Court sees no difficulty with assessments of prejudice in the penalty phase under *Strickland. See, e.g., Smith v. Spisak,* 558 U.S. 139, 130 S.Ct. 676, 175 L.Ed.2d 595 (2010). Appellant does not claim that the High Court, in direct review capital cases, requires that any error on the aggravation side be deemed *per se* prejudicial. In point of fact, the High Court made clear in decisional law predating *Williams* that there is nothing in the federal Constitution (including the Sixth Amendment and the Eighth Amendment) to prohibit a court from weighing prejudice after striking down one of multiple aggravating circumstances found by the jury, in a case where the jury weighed aggravators and mitigators: *Clemons v. Mississippi,* 494 U.S. 738, 739, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) ("[N]othing in appellate weighing or reweighing of the aggravating and mitigating circumstances is at odds with contemporary standards of fairness or ... inherently unreliable and likely to result in arbitrary imposition of the death sentence.").[9]

9. In *Clemons,* the High Court describes that in a "weighing state," an appellate court, if properly authorized by state law: (1) may re-weigh

Significant legal holdings rendered without a shred of support or explanation are problematic. *See Commonwealth v. Marconi*, 619 Pa. 401, 64 A.3d 1036, 1041–42 & nn. 5 & 7 (2013) (noting difficulties with precedent lacking developed reasoning); *accord Commonwealth v. Russo*, 594 Pa. 119, 934 A.2d 1199, 1208 n. 11 (2007) (construing constitutional claim, and noting that decisions of such matters are more secure when supported by relevant searching inquiry). Also, " '[j]udicial opinions are frequently drafted in haste, with imperfect foresight, and without due regard for the possibility that words or phrases or sentences may be taken out of context and treated as doctrines.' " *City of Scranton v. Firefighters Local Union No. 60, of Int'l Ass'n of Fire Fighters*, 612 Pa. 23, 29 A.3d 773, 787 (2011) (quoting *Maloney v. Valley Med. Facilities, Inc.*, 603 Pa. 399, 984 A.2d 478, 490 (2009) (quoting *N.W. Nat'l Ins. Co. v. Maggio*, 976 F.2d 320, 323 (7th Cir. 1992))). Absent some demonstration that the *per se* approach in *Williams* is required or appropriate under some relevant principle of law, I would limit the case to its facts and not perpetuate the error.

Furthermore, the notion that *Williams* must apply to all cases ignores the bedrock jurisprudential rule that cases must be read against their facts. In that case, unlike here, the defendant did not murder three people and risk killing others; he killed a single victim. The jury found that three aggravators (killing in the perpetration of a felony, torture, and significant history of felony convictions [10]) outweighed a single mitigator (the catchall [11]), and returned a sentence of death. On appeal in *Williams*, a divided Court struck down the

the remaining aggravating factors and any mitigating factors on its own without remanding for such re-weighing by a jury, (2) may not rely on automatic rules of affirmance, as that reliance is invalid under *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (*i.e.*, the court must actually re-weigh the factors and cannot rely on the mere presence of any "valid and undisturbed" aggravating factor as the basis for affirming the death sentence), and (3) if the court lacks authority to re-weigh under state law, the court may at least conduct a harmless error analysis. 494 U.S. at 744–54, 110 S.Ct. 1441.

10. 42 Pa.C.S. § 9711(d)(6), (d)(8), and (d)(9), respectively.

11. 42 Pa.C.S. § 9711(e)(8).

perpetration-of-a-felony aggravator because of a notice issue, and then summarily concluded it could not assess prejudice and awarded a new penalty hearing. Even indulging the dubious assumption that it is impossible to assess prejudice under those circumstances—and I am not saying there was no prejudice, I am saying that prejudice can be assessed—there should be no such difficulty here. In the context of assessing *Strickland* prejudice, both this Court and the U.S. Supreme Court have stressed the importance of powerful aggravators. *See Smith v. Spisak, supra; Gibson, supra; Lesko, supra.* It is difficult to imagine a more powerful aggravator than that the defendant committed multiple murders. *See Commonwealth v. Sepulveda,* 618 Pa. 262, 55 A.3d 1108, 1131 (2012); *Lesko,* 15 A.3d at 384–85. *Accord Smith v. Spisak.* In my view, there is nothing to prevent a merits-based assessment of prejudice in this case, even if there had been error, which there was not.

- II -

Here, shortly after appellant's incarceration, Mexico, through its consulate in Philadelphia, attempted to intervene on his behalf including, at least initially, by making an effort to secure counsel for him. On October 12, 2005, however, Mexico filed a motion with the trial court requesting appointment of taxpayer-financed counsel for appellant. Thereafter, appellant was represented by the county public defender and the trial court rebuffed efforts by Mexico to further involve itself in this criminal case except by and through appellant's counsel of record. A representative from the Mexican consulate was permitted, however, to attend status conferences and also was present at appellant's trial. Appellant now argues that an alleged discord between his appointed counsel and the Mexican government (after his country of origin had declined to secure counsel for him) contributed to his appointed counsel becoming unconstitutionally conflicted and also to violations of the Vienna Convention. The Majority Opinion rejects these claims.

On appeal, Mexico filed an *amicus curiae* brief on appellant's behalf on June 15, 2009. Strangely, Mexico's brief was authored and signed by Robert Brett Dunham, Esquire, identifying himself as counsel with the Capital Habeas Corpus Unit of the FCDO. The *amicus* brief requests that we grant the relief sought by appellant in this appeal from his convictions and death sentences.[12]

Of course, this Court welcomes the views of Mexico on behalf of Miguel Padilla, its citizen illegally in the United States of America. But, until this case, I did not realize that our federal government, which is the primary funding source for the FCDO, approves of that organization providing lawyering services for foreign governments in state litigation cases involving capital defendants. It would be a remarkable thing indeed if Congressionally-authorized financing of federal criminal defense services for the indigent also encompassed representation of the interests of non-indigent foreign sovereign nations, who in turn seek to advance the interests of their citizens illegally in this nation who have been convicted of capital murder in state courts.

Presumably, the FCDO was never appointed by a federal court to perform this *"amicus"* service for Mexico in support of a convicted murderer. Even assuming that the FCDO has a sufficient private budget to undertake expeditionary tasks, such as this, and further assuming that the Administrative Office of Federal Courts approves of such extracurricular activities by block-grant-funded federal defender organizations, there is a question of whether the briefing activity here in fact was supported exclusively with non-federal taxpayer money. In this regard, I note that Attorney Dunham withdrew his appearance on behalf of Mexico by *praecipe* filed on October 12, 2011; that same day, Marc Bookman, Esquire, of the Atlantic Center for Capital Representation, entered his appearance, "substituting" for Attorney Dunham as counsel of

12. The name of Professor Sandra L. Babcock of the Center for International Human Rights at Northwestern Law School appears below Attorney Dunham's name on the brief, though Ms. Babcock did not sign it.

record for Mexico. The timing and substitution may be significant. On October 3, 2011, this Court entered an Order in *Commonwealth v. Spotz*, 576 CAP, directing the FCDO to file a Verified Statement which, among other things, was to identify all Pennsylvania state capital cases in which the FCDO was currently involved, how the FCDO's involvement came about, and if the involvement did not involve a court appointment, under what authority the FCDO undertook to appear. That Verified Statement was filed with this Court on October 13, 2011, the day after Attorney Dunham withdrew his appearance in this appeal. Given the withdrawal, the FCDO's Verified Statement does not list this case as one in which it was involved.

The federal statutes governing defender services do not authorize federally-financed lawyers to appear in state court capital cases at all, unless they have specifically been appointed to do so by a federal *habeas corpus* court. Even then, the power to employ federal tax dollars to support state court litigation is limited to matters subsequent or ancillary to the actual pursuit of a federal *habeas corpus* petition—matters such as requests for clemency once federal *habeas* relief has been denied. *See* 18 U.S.C. § 3006A(a)(2)(B) (authorizing federal court to appoint counsel to represent indigent state or federal prisoners in federal *habeas corpus* matters); *id.* § 3006A(c) (where counsel is appointed to represent indigent federal *habeas* petitioner, appointment continues through appeal, and includes "ancillary matters appropriate to" the federal *habeas* proceeding); *id.* § 3599(a)(2) (authorizing appointment of counsel to indigent state defendants seeking to vacate or set aside death sentence via federal *habeas* review). *See also Harbison v. Bell*, 556 U.S. 180, 188–90 & n. 7, 129 S.Ct. 1481, 173 L.Ed.2d 347 (2009) (Section 3599 authorizes federally appointed *habeas* counsel to represent prisoner in subsequent state clemency proceedings; stressing that legislation does not authorize pursuit of litigation in state court in advance of federal *habeas* proceedings).

I am unaware of any Congressional authorization for taxpayer-financed federal defenders to appear in state capital

direct appeals to represent the political interests of a foreign nation relating to that nation's citizens convicted of capital murder. It is possible that the Administrative Office inexplicably signed off on the activity and that the FCDO ensured that not a penny of federal funds was deployed to support such activity here. On the other hand, Attorney Dunham presumably is paid a full-time salary and is afforded generous benefits. Perhaps Attorney Dunham worked strictly on weekends from home or on vacation in preparing Mexico's brief; did not avail himself of federally-financed FCDO support staff, computer equipment, or research resources; and used private or Mexican funds to print, bind, deliver and serve his work product on behalf of a foreign nation. But, even if that were the case, and some mechanism were in place to avoid such abuses by the FCDO, that would still not answer the question of whether an organization whose primary function involves federally financed representation of capital defendants in federal court should make these sorts of forays into state courts.

The problem is more acute because the FCDO refuses to be candid about its manner of deploying federal resources in state court, as evidenced by, *inter alia,* the federal removal actions it has filed in response to modest inquiries into the propriety of its activities in representing state prisoners in capital PCRA matters. *See, e.g., In re Commonwealth's Request for Relief Against or Directed to Defender Ass'n of Philadelphia,* 2013 WL 4458885, *1 n. 2 (M.D.Pa.2013) (memorandum by Caputo, J.) (*noting "[a]t* least six other similarly situated proceedings have been removed to federal court."). Leaving aside the merit of the FCDO's claim in those actions that they are somehow acting as "federal officers" when they appear in state court, without the authority of a federal court order, to provide representation to state court defendants who have no right to federally-financed representation, to my knowledge, there is nothing that **precludes** them from being candid when they appear in state court. In a world of increasing budget crunches, and indeed of sequestrations, surely federal taxpayers in Pennsylvania are entitled to know whether the FCDO has inappropriately diverted federal funds

to finance extensive state court activities over the years, all in advance of federal *habeas* review. Even if the FCDO declines to be candid, presumably there is some federal authority— Congress, after all, controls the purse strings—that can secure answers for the public.

In any event, what is certain is that these sorts of extracurricular (indeed extra-national) activities by the FCDO cause delay in other state capital matters where the FCDO has involved itself. For example, Attorney Dunham cited his *amicus* endeavor on behalf of Mexico in this case as a reason to secure a briefing extension in the *Spotz* case (motion filed June 2, 2009). The FCDO's conduct here corroborates this Court's grounded concerns with the FCDO's broad agenda in Pennsylvania capital cases, and the propriety of its activity. *See Commonwealth v. Porter*, 613 Pa. 510, 35 A.3d 4, 22–24 (2012); *Commonwealth v. Birdsong*, 611 Pa. 203, 24 A.3d 319, 353–54 (2011) (Castille, C.J., concurring) (discussing *Commonwealth v. Spotz*, 610 Pa. 17, 18 A.3d 244, 329–49 (2011) (Castille, C.J., concurring, joined by McCaffery, J.)).

Justice EAKIN joins this opinion.

Justice SAYLOR, concurring and dissenting.

I concur in the result as to the denial of guilt-phase relief but do not support affirmance of the penalty verdict.

It is a matter of record that an arbitrary factor was interjected directly into the weighing process performed by Appellant's capital sentencing jury. In this regard, as the majority opinion aptly discusses, the stipulation serving as the basis for the in-perpetration-of-a-felony aggravator was self-provingly erroneous. *See* Majority Opinion, at 504–06, 80 A.3d at 1270–71 (explaining that the sole predicate offense advanced by the Commonwealth to prove the in-perpetration-of-a-felony aggravator simply was not a felony). Moreover, under the capital sentencing regime, this Court is tasked with undertaking an independent review of death penalty verdicts for arbitrariness. *See* 42 Pa.C.S. § 9711(h)(3)(i).

The majority relies on *Commonwealth v. Chambers*, 602 Pa. 224, 980 A.2d 35 (2009), as a basis for withholding statutory arbitrariness review concerning the improper aggravator. *See* Majority Opinion, at 506–09, 80 A.3d at 1272–73. In my view, however, *Chambers* is distinguishable, since it does not involve the injection by the Commonwealth of an indisputably flawed aggravator directly into the weighing determination undergirding a death verdict. *See Chambers*, 602 Pa. at 259–65, 980 A.2d at 55–59. Instead, I believe this case bears closer resemblance to a decision cited by Appellant, *Commonwealth v. Boczkowski*, 577 Pa. 421, 846 A.2d 75 (2004), where the Court recognized the unacceptable arbitrariness in a sentencing jury's consideration of an improper aggravator and awarded relief consistent with Section 9711(h)(3). *See id.* at 465–67 & n. 25, 846 A.2d at & 101–02 & n. 25.

Thus, while *Chambers* reflects the Court's practice to defer to post-conviction review the wider array of claims interwoven with deficient stewardship, the Legislature has required us to independently review death penalty verdicts for arbitrariness, *see* 42 Pa.C.S. § 9711(h)(3), and I do not regard the deferral practice as entirely supplanting such statutory review responsibility.

I also do not agree with the majority that a "sufficiency" analysis tied to a legally erroneous stipulation, *see* Majority Opinion, at 506–07, 80 A.3d at 1272, can serve to shore up an improper aggravator when assessing the present validity of the weighing process.[1] Finally, I am not persuaded by the Commonwealth's argument that the ordinary consequence attending its advancement of an improper aggravator should not ensue here, based on what it might have put before the sentencing jury, had it realized its mistake at an earlier time.

---

1. The application of a sufficiency analysis resting upon the face of the stipulation is confusing in the first instance, since stipulations in the nature of judicial admissions are not evidence in and of themselves, but, rather, serve to dispense with the need for formal proof of facts. *See Bartholomew v. State Ethics Comm'n*, 795 A.2d 1073, 1078 (Pa.Cmwlth. 2002). In any event, I cannot agree with the majority that a stipulation which is legally erroneous on its face "constituted sufficient support for the jury's finding of [the] aggravating factor 9711(d)(6)." Majority Opinion, at 507, 80 A.3d at 1272.

In this regard, I simply do not believe the capital sentencing process is amenable to such revisionism. *Accord Boczkowski,* 577 Pa. at 466, 846 A.2d at 102 (rejecting "after-the-fact-explanations" in an analogous context).[2]

In summary, although there certainly are grounds for questioning whether deficient stewardship on the part of Appellant's counsel may have accompanied the unfortunate circumstances at hand, the Commonwealth should be held, at the very least, to be the master of its own claims of aggravation in pursuing the death penalty. Here, it bears responsibility for the advancement of a self-provingly erroneous aggravator. I believe this forecloses the finding, necessary to affirmance, that the death verdict is not the product of an arbitrary factor. *Accord Commonwealth v. Williams,* 539 Pa. 61, 80–81, 650 A.2d 420, 430 (1994) ("[W]e are not in a position to determine whether the lack of the aggravating circumstance struck down would have changed the jury's determination, and, pursuant to 42 Pa.C.S. § 9711(h)(4), we are required to vacate the penalty of death and remand for a new sentencing hearing.").

Justice TODD joins this concurring and dissenting opinion.

Justice BAER, concurring and dissenting.

I join in full the Concurring and Dissenting Opinion by Justice Saylor. I write separately to respond to the Chief Justice's concurrence to the extent it can be read as a criticism of the reasoning underlying Justice Saylor's responsive opinion. The Chief Justice implies that the Concurring and Dissenting Opinion is ignoring the facts of the case to address a legal principal. Concurring Opinion at 514, 80 A.3d at 1276–77 (Castille, C.J.) (asserting that "many issues that are initially

---

**2.** It bears mention that the in-perpetration-of-a-felony aggravating circumstance has been profoundly broadened from its original formulation centered on six specific felonies (robbery, rape, deviate intercourse by force or threat of force, arson, burglary, and kidnapping). *See generally Commonwealth v. Robinson,* 583 Pa. 358, 392–99, 877 A.2d 433, 453–58 (2005) (Saylor, J., dissenting) (discussing the widening of the Section 9711(d)(6) aggravator). At the very least, the Commonwealth should be held to a standard of advancing an actual felony within the now expansive range of available ones.

presented as pristine questions of law, involving matters of great legal moment, melt away when measured by the record facts"), 1276 ("Facts are inconvenient to some claims."). To the contrary, I conclude that the Concurring and Dissenting Opinion is fully supported by the facts as set forth by my colleagues in the Majority.

In his responsive opinion, Justice Saylor concludes that the aggravating circumstance that the murder was committed in perpetration of a felony, 42 Pa.C.S. § 9711(d)(6), was interjected as an arbitrary factor into the penalty phase jury deliberations because it was based on 18 Pa.C.S. § 6105(c)(5),[1] despite the fact that violation of Section 6105(c)(5) is not a felony. While the Concurring Opinion recognizes that a violation of Section 6105(c)(5) could not support the statutory aggravator, it nonetheless concludes that "appellant's conduct obviously implicated" 18 Pa.C.S. § 6106(a)(1), a different violation of the Uniform Firearms Act that constitutes a felony sufficient to satisfy the aggravating circumstance.[2] Concurring Opinion at 522–24, 80 A.3d at 1281–82 (Castille, C.J.). The Concurring Opinion further opines that "the Commonwealth could prove the Section 6106 [ (a)(1) ] felony by showing that appellant was an illegal alien," who cannot possess a firearm, notwithstanding that this issue was never introduced into the penalty phase. *Id.* at 530, 80 A.3d at 1286–87. As argued by Appellant, I respectfully conclude that the elements of 18 Pa.C.S. § 6106(a)(1) are not met, even under the factual summaries set forth by my colleagues. Brief of Appellant at 45–46.

Section 6106(a)(1) provides that an individual commits a felony of the third degree if the individual "carries a firearm in any vehicle" or "carries a firearm concealed on or about his person" without a license. The facts set forth in both the

1. In relevant part, 18 Pa.C.S. § 6105(c)(5) prohibits, inter alia, the possession, use or control of a firearm by "[a] person who, being an alien, is illegally or unlawfully in the United States."

2. 18 Pa.C.S. § 6106(a)(1) provides, "Except as provided in paragraph (2), any person who carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license under this chapter commits a felony of the third degree."

Majority Opinion and the Concurring Opinion provide that Appellant retrieved the weapon from his friend, Travis Shumaker's car, Concurring Opinion at 515, 80 A.3d at 1277 (Castille, C.J.), and was seen openly carrying the firearm across the parking lot before shooting the victims, Maj. Op. at 462, 80 A.3d at 1245. Additionally, the gun was registered to Mr. Shumaker and apparently kept under the front seat of Shumaker's car. Maj. Op. at 465, 80 A.3d at 1247. While I acknowledge that Appellant, as an illegal alien, did not have a license to carry a firearm concealed or in a vehicle, as required for violation of Section 6106(a)(1), I am unable to conclude that Appellant, rather than Shumaker, "carrie[d] a firearm in any vehicle." [3] Similarly, the facts set forth by my colleagues do not indicate that he concealed the weapon in any way, but rather state that he was seen carrying the firearm as he crossed the parking lot. Maj. Op. at 462, 80 A.3d at 1245.

While I recognize that the Commonwealth could have introduced more evidence that might have supported a felony conviction under Section 6106(a)(1), it is wholly improper to assume or infer the existence of this felony to justify the aggravating circumstance that the murder was committed in perpetration of a felony. I agree with Justice Saylor that the aggravating circumstance was an arbitrary factor considered by the jury because the crime relied upon was a misdemeanor rather than a felony. While I agree with the sentiments of the Chief Justice that the jury could have found that the remaining aggravators in this triple murder outweighed the mitigating circumstances, Concurring Opinion at 532, 80 A.3d at 1287 (Castille, C.J.); I conclude that the jury's determination must be set aside because it may have been influenced by the invalid aggravating circumstance. Accordingly, as this Court "shall affirm the sentence of death unless it determines that: (i) the sentence of death was the product of passion, prejudice or any other arbitrary factor," 42 Pa.C.S.

3. I recognize that evidence was produced that Appellant drove Mr. Shumaker in Shumaker's car on the night of the murders because he did not intend to drink. Maj. Op. at 462–64, 80 A.3d at 1245–46. I do not view this evidence as conclusively establishing a violation of Section 6106(a)(1), as it does not indicate whether Mr. Shumaker or Appellant carried the firearm in the vehicle.

§ 9711(h)(3)(i), I conclude that we should vacate the death sentence and remand for new sentencing hearing, rather than deferring this issue to post-conviction review of counsel's ineffectiveness.